No. 20-5969

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

———————————

MEMPHIS CENTER FOR REPRODUCTIVE HEALTH; PLANNED
PARENTHOOD OF TENNESSEE AND NORTH MISSISSIPPI; KNOXVILLE
CENTER FOR REPRODUCTIVE HEALTH; FEMHEALTH USA, INC.; DR.
KIMBERLY LOONEY; DR. NIKKI ZITE,
*Plaintiffs-Appellees*

v.

HERBERT H. SLATERY III; LISA PIERCEY, M.D.; RENE SAUNDERS,
M.D.; W. REEVES JOHNSON, JR., M.D.; HONORABLE AMY P. WEIRICH;
GLENN R. FUNK; CHARME P. ALLEN; TOM P. THOMPSON, JR.,
*Defendants-Appellants*

———————————

On Appeal from the United States District Court for the
Middle District of Tennessee
(No. 3:20-cv-00501)

---

## PETITION FOR REHEARING EN BANC

---

HERBERT H. SLATERY III
  Attorney General and Reporter
  of the State of Tennessee

ANDRÉE S. BLUMSTEIN
  Solicitor General

SARAH K. CAMPBELL
  Associate Solicitor General
  *Counsel of Record*

CLARK L. HILDABRAND
  Assistant Solicitor General

P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Sarah.Campbell@ag.tn.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

RULE 35(b)(1) STATEMENT ...............................................................1

INTRODUCTION ...................................................................................2

STATEMENT ..........................................................................................4

REASONS FOR GRANTING EN BANC REVIEW ...............................9

    I.     The Panel's Vagueness Holding Conflicts with Binding Precedent.....9

    II.    The Panel's Substantive-Due-Process Analysis Conflicts with Binding Precedent. .............................................................................13

    III.   This Case Presents an Exceptionally Important Question. .................15

CONCLUSION ......................................................................................18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Commc'ns Ass'n v. Douds*,
339 U.S. 382 (1950) ........................................................................12

*Bristol Reg'l Women's Ctr., P.C. v. Slatery*,
7 F.4th 478 (6th Cir. 2021) (en banc) .....................................1, 13, 15

*Colautti v. Franklin*,
439 U.S. 379 (1979) .......................................................3, 16, 17, 18

*EMW Women's Surgical Ctr., P.S.C. v. Friedlander*,
978 F.3d 418 (6th Cir. 2020) ..............................................1, 3, 13, 15

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) ....................................................................2, 13

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ...................................................................1, 3, 11

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ..........................................................................9

*Hope Clinic v. Ryan*,
195 F.3d 857 (7th Cir. 1999) (en banc) .............................................17

*Jackson Women's Health Org. v. Dobbs*,
945 F.3d 265 (5th Cir. 2019) ...........................................................14

*June Med. Servs. L.L.C. v. Russo*,
140 S. Ct. 2103 (2020) ......................................................................3

*Karlin v. Foust*,
188 F.3d 446 (7th Cir. 1999) .......................................................2, 17

*McCorvey v. Hill*,
385 F.3d 846 (5th Cir. 2004) ...........................................................14

*MKB Mgmt. Corp. v. Stenehjem*,
795 F.3d 768 (8th Cir. 2015) ...........................................................14

*Preterm-Cleveland v. McCloud*,
    994 F.3d 512 (6th Cir. 2021) (en banc) ...................................... 2, 5, 7

*Roe v. Wade*,
    410 U.S. 113 (1973) .......................................................... 6, 7, 13, 14

*Schickel v. Dilger*,
    925 F.3d 858 (6th Cir. 2019) ................................................................ 9

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ........................................................................ 14

*United States v. Paull*,
    551 F.3d 516 (6th Cir. 2009) ................................................ 1, 10, 11

*United States v. Williams*,
    553 U.S. 285 (2008) ................................................................. *passim*

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ............................................................................ 11

*Voinovich v. Women's Med. Prof'l Corp.*,
    523 U.S. 1036 (1998) ......................................................................... 17

*Women's Med. Prof'l Corp. v. Voinovich*,
    130 F.3d 187 (6th Cir. 1997) ................................................... *passim*

**Statutes**

2020 Tenn. Pub. Acts, ch. 764 ...................................................................... 4

Ohio Rev. Code § 2919.10(B) ....................................................................... 2

Tenn. Code Ann. § 39-15-211(a)(2) .............................................................. 4

Tenn. Code Ann. § 39-15-211(a)(3) .............................................................. 5

Tenn. Code Ann. § 39-15-214(a)(24) ............................................................ 4

Tenn. Code Ann. § 39-15-214(a)(59) ............................................................ 4

Tenn. Code Ann. § 39-15-214(a)(61) ............................................................ 4

Tenn. Code Ann. § 39-15-214(a)(63) ............................................................ 4

Tenn. Code Ann. § 39-15-214(a)(68) ........................................................4

Tenn. Code Ann. § 39-15-214(a)(69) ........................................................4

Tenn. Code Ann. § 39-15-214(a)(72) ........................................................4

Tenn. Code Ann. § 39-15-214(a)(76) ........................................................4

Tenn. Code Ann. § 39-15-214(a)(77) ........................................................4

Tenn. Code Ann. § 39-15-216(a)(3) ..........................................................4

Tenn. Code Ann. § 39-15-216(c)(1)-(12) ...............................................1, 4

Tenn. Code Ann. § 39-15-217(b).............................................................1, 4

Tenn. Code Ann. § 39-15-217(c) .............................................................1, 4

Tenn. Code Ann. § 39-15-217(d).............................................................1, 4

Tenn. Code Ann. § 39-15-217(e)(1) ..........................................................5

**Other Authorities**

Fed. R. App. P. 35(b)(1)............................................................................1

## RULE 35(b)(1) STATEMENT

Tennessee law prohibits doctors from performing abortions when the unborn child has a fetal heartbeat or reaches certain gestational ages, Tenn. Code Ann. § 39-15-216(c)(1)-(12) ("Timing Provisions"), or when the doctor knows the abortion is being sought because of the unborn child's sex, race, or Down syndrome diagnosis, *id.* § 39-15-217(b)-(d) ("Antidiscrimination Provision"). A divided panel of this Court held that the Timing Provisions violate the right to pre-viability abortion and that the Antidiscrimination Provision is unconstitutionally vague.

The panel's vagueness holding warrants en banc review because it directly conflicts with precedents of the Supreme Court and this Court holding that close cases do not render a statute vague, *see United States v. Williams*, 553 U.S. 285, 304-06 (2008); *United States v. Paull*, 551 F.3d 516, 525-26 (6th Cir. 2009), and that scienter requirements alleviate vagueness concerns, *see Gonzales v. Carhart*, 550 U.S. 124, 149-50 (2007).

The panel's rational-basis analysis also warrants en banc review because it conflicts with this Court's recent precedents confirming that abortion laws are subject to traditional rational-basis review, *see Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 483 (6th Cir. 2021) (en banc); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 438-40 (6th Cir. 2020), as well as settled

precedent emphasizing the deferential nature of that standard, *see, e.g.*, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993).

Finally, this case presents a question of exceptional importance: whether a medical-emergency provision with subjective and objective standards but no scienter element is unconstitutionally vague. In *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 204-06 (6th Cir. 1997), this Court held that it is. But *Voinovich*, which conflicts with *Karlin v. Foust*, 188 F.3d 446, 460-64 (7th Cir. 1999), should be reconsidered.

## INTRODUCTION

Less than six months ago, the en banc Court upheld an Ohio law that prohibits a doctor from performing an abortion with "knowledge that the pregnant woman is seeking the abortion, in whole or in part, because" the unborn child has Down syndrome. *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 517 (6th Cir. 2021) (en banc) (quoting Ohio Rev. Code § 2919.10(B)). This Court had no trouble determining what conduct the Ohio law prohibits. *Id.* at 527, 529. And it concluded that the law does not violate the right to abortion because it furthers legitimate interests without preventing a large fraction of affected women from obtaining abortions. *Id.* at 527-29.

The panel in this case circumvented *Preterm-Cleveland* by holding Tennessee's materially similar Antidiscrimination Provision unconstitutionally

2

vague and casting doubt on the important government interests that underly it. To do so, it used "the abortion right" as a "bulldozer to flatten legal rules that stand in the way." *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2153 (2020) (Alito, J., dissenting). Voicing concerns about hypothetical close cases, it held unconstitutionally vague an unambiguous criminal statute with a scienter requirement. *But see Williams*, 553 U.S. at 305-06 (rejecting argument that the "mere fact that close cases can be envisioned renders a statute vague"); *Gonzales*, 550 U.S. at 149 (reiterating "that scienter requirements alleviate vagueness concerns"). And it deemed the State's interests in preventing discriminatory abortions illegitimate because it thought the law was bad policy. *But see EMW*, 978 F.3d at 438 (a federal court's belief that a law is not "sound policy" is irrelevant under rational-basis review).

Those errors are reason enough to grant en banc review. But this case also presents an opportunity to reexamine *Voinovich*'s holding that a medical-emergency exception with subjective and objective standards and no scienter requirement is unconstitutionally vague. 130 F.3d at 205. That holding misconstrues *Colautti v. Franklin*, 439 U.S. 379 (1979), conflicts with decisions of other circuits, and is long overdue for correction.

Tennessee enacted the Timing Provisions and Antidiscrimination Provision in June 2020 as part of H.B. 2263. *See* 2020 Tenn. Pub. Acts, ch. 764. The Timing Provisions prohibit performing an abortion when the unborn child has a fetal heartbeat or is 8, 10, 15, 18, 20, 21, 22, 23, or 24 or more weeks. Tenn. Code Ann. § 39-15-216(c)(1)-(12).[1] The Antidiscrimination Provision prohibits performing an abortion "if the person knows that the woman is seeking the abortion because of the sex of the unborn child," *id.* § 39-15-217(b); "the race of the unborn child," *id.* § 39-15-217(c); or "a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome in the unborn child," *id.* § 39-15-217(d).

The legislature made extensive findings that these laws would further the State's interests in protecting unborn life, preventing fetal pain, eradicating discrimination, protecting the integrity of the medical profession, and promoting human dignity. Tenn. Code Ann. § 39-15-214(a)(61), (63), (68)-(69), (72), (76)-(77). The findings focused on fetal development, including the "growing body of medical evidence" that unborn children experience pain well before viability, *id.* § 39-15-214(a)(24), and evidence that abortion is being used to "eliminate children with unwanted characteristics." *Id.* § 39-15-214(a)(59).

---

[1] These ages are "calculated from the first day of" the pregnant woman's "last menstrual period." Tenn. Code Ann. § 39-15-211(a)(2); *see also id.* § 39-15-216(a)(3).

Both the Timing Provisions and the Antidiscrimination Provision include affirmative defenses that apply when, "in the physician's reasonable medical judgment, a medical emergency prevented compliance with the provision." *Id.* §§ 39-15-216(e)(1), -217(e)(1). The term "medical emergency" means "a condition that, in the physician's good faith medical judgment, . . . so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion." *Id.* § 39-15-211(a)(3).

Plaintiffs—abortion clinics and individual physicians—challenged the Timing Provisions and the Antidiscrimination Provision under the Due Process Clause. Compl., R.1, PageID#1-34. They alleged that (1) both laws violate their patients' right to pre-viability abortion; (2) the medical-emergency affirmative defenses are unconstitutionally vague under *Voinovich*; and (3) the Antidiscrimination Provision fails to sufficiently define the conduct it prohibits. *Id.* ¶¶ 121, 123, 125, 127, PageID#30-31.

The district court preliminarily enjoined the State from enforcing both laws. PI Opinion, R.41, PageID#727-68; PI Order, R.42, PageID#769. It held that Plaintiffs would likely succeed on their claim that the Timing Provisions violate the right to abortion. PI Opinion, R.41, PageID#756. Because the en banc proceedings in *Preterm-Cleveland* were pending, the district court declined to consider whether the Antidiscrimination Provision violates the right to abortion. *Id.* at PageID#758-

5

59.  It instead held the Antidiscrimination Provision unconstitutionally vague for failing to sufficiently define the prohibited conduct.  *Id.* at PageID#758-61.  It further held the medical-emergency affirmative defenses vague because it was "bound to follow" *Voinovich* "[u]nless and until the Sixth Circuit overturns" that decision.  *Id.* at PageID#766.

On November 20, 2020, a motions panel of this Court stayed the preliminary injunction to the extent it barred enforcement of the Antidiscrimination Provision, concluding that the district court's vagueness rulings would likely be reversed on appeal.  *See* Order, Dkt. 33-2, at 4.

The partial stay remained in effect until September 10, 2021, when a divided panel of this Court affirmed the preliminary injunction on the merits.  The panel majority held the Timing Provisions unconstitutional under the undue-burden standard on the theory that they pose a substantial obstacle to abortion.  Op. 20.[2]  It further concluded that the "justifications" the State "offered in court" to support the Timing Provisions were "mere pretext" for challenging *Roe v. Wade*, 410 U.S. 113 (1973).  Op. 22.  Based on this pretext analysis, the panel determined that the law had the "*purpose* . . . of placing an obstacle in the path of a woman seeking an

---

[2] The Supreme Court will soon consider whether a Mississippi law prohibiting elective abortions after 15 weeks is constitutional.  *See Dobbs v. Jackson Women's Health Org.*, No. 19-1392 (U.S.).  *Dobbs* provides no reason to deny the State's petition because the panel's vagueness holdings independently warrant en banc review.

abortion" and thus could not be "considered a permissible means of serving [the State's] legitimate ends." *Id.* (quotation marks omitted).

The panel declined to address Plaintiffs' substantive-due-process challenge to the Antidiscrimination Provision because the district court had yet to consider it. Op. 31. While acknowledging that "*Preterm-Cleveland* would be relevant to the Down syndrome clause of" the Antidiscrimination Provision, the panel considered the constitutionality of the race and sex clauses an open question. *Id.* It therefore instructed the district court to "analyze . . . the bans on abortions for reasons of race and sex" separately and "scrutinize the underlying data purported to support the State's rationale" for those provisions "to confirm whether the interests are indeed legitimate." *Id.* at 31-32. And the panel made clear that, in its view, those interests are not legitimate. *Id.*

Undeterred by *Preterm-Cleveland* or any other precedent, the panel held the Antidiscrimination Provision void for vagueness. It did not find the actual language of the statute unclear. It accepted the State's position that the term "knows" means actual knowledge and that "because of" incorporates a but-for causation standard. *Id.* at 25. It nevertheless concluded that the Antidiscrimination Provision is unconstitutionally vague because it "requires that a doctor know the motivations underlying the action of *another* person to avoid prosecution while simultaneously evaluating whether the decision is 'because of' that subjective knowledge." *Id.*

(quotation marks omitted). The panel reasoned that the statute "encourages arbitrary enforcement" by allowing judges and juries to decide "what constitutes illegal behavior." *Id.* And it declined to adopt a narrowing construction or certify a question to the Tennessee Supreme Court. *Id.* at 30 n.16.

Finally, after noting that the "facts and law support" the district court's determination that the medical-emergency provisions are unconstitutionally vague under *Voinovich*, the panel found it "unnecessary to decide" that issue since it had affirmed the "injunction on other grounds." *Id.* at 33.

Judge Thapar concurred in the judgment in part and dissented in part. He concurred in the panel's judgment that the Timing Provisions are unconstitutional "under the *Roe/Casey* framework," while explaining in depth why "those precedents are wrong." *Id.* at 36, 41 (Thapar, J., concurring in the judgment in part and dissenting in part). But he dissented from the panel's judgment that the Antidiscrimination Provision is unconstitutionally vague because the statute has a "core meaning" that is sufficient to give doctors fair notice of what is prohibited, *id.* at 65, as well as a "knowledge requirement" that further alleviates any vagueness concerns, *id.* at 67. Judge Thapar rejected the panel's view that "a judge's hypothetical" can "make a statute void for vagueness" and cited examples of other state and federal laws that similarly "requir[e] proof that a defendant knew another person's state of mind," all of which would be unconstitutional "under the majority's

8

reasoning." *Id.* And he criticized the majority for "annihilat[ing] a separate sovereign's statute" without first giving the State's own courts an opportunity to construe the law. *Id.* at 69.

## REASONS FOR GRANTING EN BANC REVIEW

### I.    The Panel's Vagueness Holding Conflicts with Binding Precedent.

The panel's holding that the Antidiscrimination Provision is unconstitutionally vague warrants en banc review because it contravenes binding precedent and calls into question the constitutionality of numerous other laws requiring proof that a defendant knew the mental state of another person.

The threshold for invalidating a law on vagueness grounds is high. A law is unconstitutionally vague only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. "[P]erfect clarity and precise guidance have never been required," even for criminal laws that implicate constitutional rights. *Id.*; *see also, e.g.*, *Schickel v. Dilger*, 925 F.3d 858, 879 (6th Cir. 2019). If it is "clear what the [law] as a whole prohibits," a vagueness challenge must be rejected. *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

Importantly, "the mere fact that close cases can be envisioned" will not "render[] a statute vague." *Williams*, 553 U.S. at 305. *Williams* rejected a vagueness

challenge to a criminal statute "requir[ing] that the defendant hold . . . the belief that the material is child pornography." *Id.* at 306. The Court explained that "[w]hether someone held a belief or had an intent is a true-or-false determination, not a subjective judgment." *Id.* The Court acknowledged that "it may be difficult in some cases to determine whether these clear requirements have been met," but this close-case problem "is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Id.* at 305-06.

This Court followed *Williams* in *Paull*, 551 F.3d at 525-26. The defendant argued that a law prohibiting the knowing possession of child pornography was unconstitutionally vague because he "lack[ed] the capacity to know whether the charged items contain actual minors" or constitutionally protected "virtual images of simulated child pornography." *Id.* at 525. His argument was not that "a person cannot read the statute and determine what is illegal" but instead that, "knowing what is illegal, he cannot distinguish between the prohibited and the permitted." *Id.* This Court easily rejected that argument, explaining that the defendant's "refuge" is "putting the government to its burden to prove that he possessed child pornography." *Id.* at 526.

The panel decision squarely conflicts with these precedents. The panel committed "fundamental error" by "focus[ing] on the fact that" the Antidiscrimination Provision "may generate close cases and not the statute's

sufficiently clear description of the prohibited conduct." *Paull*, 551 F.3d at 525. Critically, the panel did not find the actual terms of the Antidiscrimination Provision vague. It instead pointed to hypothetical "ambiguous situations" in which it might be difficult to determine whether a provider had violated the statute. Op. 26-27. But *Williams* and *Paull* foreclose this approach.

The panel also turned precedent on its head by holding that the knowledge requirement *creates*—rather than alleviates—vagueness concerns. *Gonzales*, 550 U.S. at 149-50. The Antidiscrimination Provision applies only when a doctor has *actual knowledge* that the abortion is being sought because of a protected characteristic. Although the panel acknowledged that "a scienter requirement may mitigate a law's vagueness," Op. 25 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)), it refused to follow that rule by positing that this law "requires that a doctor know the motivations underlying the action of *another* person," *id.* But the Antidiscrimination Provision does not *require* a doctor to know why someone is seeking an abortion. To the contrary, it applies only when the doctor *in fact knows* that the abortion is being sought *because of* a prohibited reason. If the doctor does not know, then the Antidiscrimination Provision does not prohibit the abortion. The knowledge requirement thus "shields those acting in good faith," Op. 67 (Thapar, J., concurring in the judgment in part and dissenting in part), and precluded the panel's vagueness holding.

11

Precedent likewise forecloses the panel's concerns about arbitrary enforcement. The panel worried that allowing a jury to determine whether the prosecution had proved knowledge would impermissibly delegate legislative authority. Op. 25. But whether a defendant possesses the requisite state of mind is a "clear question[] of fact." *Williams*, 553 U.S. at 306. And "courts and juries every day pass upon knowledge, belief and intent." *Id.* (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 411 (1950)). If the panel is right that allowing juries to decide this question is impermissible, then every criminal law with a scienter requirement is unconstitutional.

As Judge Thapar explained, the panel decision also casts doubt on a host of federal and state criminal laws that similarly require "proof that a defendant knew another person's state of mind," including the laws of other sovereign States in this Circuit. Op. 68 (Thapar, J., concurring in judgment in part and dissenting in part); *see also* Brief of Kentucky, et al. at 4-6. And the decision clashes with principles of federalism, which require a federal court to "undertake an especially diligent effort to uphold" a state law by, among other things, interpreting it to avoid constitutional problems or allowing the State's courts to clarify its reach through certification or case-by-case adjudication. Op. 69.

Since binding precedent blocked Plaintiffs' vagueness arguments at every turn, the panel's holding can only be explained as the latest example of "abortion

12

exceptionalism." Op. 63 (Thapar, J., concurring in part in the judgment and dissenting in part). This Court should grant en banc review to correct course.

## II. The Panel's Substantive-Due-Process Analysis Conflicts with Binding Precedent.

The panel did not limit its abortion exceptionalism to the void-for-vagueness doctrine. It also applied an abortion-specific version of rational-basis review that bears no resemblance to "traditional rational-basis review." *Bristol Reg'l*, 7 F.4th at 483 (quoting *EMW*, 978 F.3d at 440).

Rational-basis review is a "highly deferential" standard "designed to respect the constitutional prerogatives of democratically accountable legislatures." *Id.* (quotation marks omitted). "All that matters" under that standard "is whether the state conceivably had a rational basis to enact the regulation." *Id.* The State's rationales need not be supported with evidence and are not "subject to courtroom fact-finding." *Id.* at 484 (quoting *Beach Commc'ns*, 508 U.S. at 484). The challengers must instead "negative every conceivable basis which might support" the law, "whether or not the basis has a foundation in the record," *id.* (quotation marks omitted), or "actually motivated the legislature," *Beach Commc'ns*, 508 U.S. at 315.

The panel twice flouted these principles. *First*, citing a single legislator's remarks about overturning *Roe*, the panel "question[ed]" whether the state interests underlying the Timing Provisions "are, in fact, genuine." *Id.* Based solely on this

cherry-picked legislative history, the panel deemed it "likel[y] that the justifications offered in court have been mere pretext." *Id.* at 22. But the Timing Provisions survive rational-basis review because they "can *reasonably be understood* to result from a justification independent of unconstitutional grounds." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417, 2420 (2018) (emphasis added). They are at least "plausibly related to" the State's legitimate interests in protecting unborn life, preventing fetal pain, and safeguarding the integrity of the medical profession, so the panel was wrong to deem them "illegitimate under rational-basis review." *Id.* at 2420.

The panel's pretext analysis also rests on the erroneous premise that overturning *Roe* is not a legitimate interest. One of the chief criticisms of the *Roe/Casey* framework is that it usurps state legislative authority and prevents state lawmakers from responding to factual developments. *See, e.g.*, *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 774 (8th Cir. 2015); *McCorvey v. Hill*, 385 F.3d 846, 850 (5th Cir. 2004) (Jones, J., concurring). Overturning *Roe* is thus a necessary step to furthering other state interests that the Supreme Court and this Court have repeatedly recognized as legitimate. *See* Appellants' Brief at 51-53. The panel concluded otherwise only by wrongly equating opposition to *Roe* with impermissible animus. *Cf. Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 283 (5th Cir. 2019) (Ho., J., concurring in judgment), *cert. granted*, --- S. Ct. ---, No. 19-1392, 2021 WL 1951792 (May 17, 2021).

*Second*, although purporting not to reach the substantive-due-process challenge to the Antidiscrimination Provision, the panel gave the district court detailed instructions for invalidating the law at least in part on those grounds on remand—instructions at odds with traditional rational-basis review. It admonished the district court to "scrutinize the underlying data purported to support" the interests underlying the law's sex and race clauses "to confirm whether [they] are indeed legitimate." Op. 31. The panel expounded that "[t]he lack of data and failure to analyze the root of the cited problems . . . undercut" the State's arguments that sex and race discrimination "are legitimate concerns." *Id.* at 31-32. But States are not required to produce *any* evidence to support the rationality of an enacted law, and federal courts are prohibited from scrutinizing or second-guessing a State's policy judgments. *See Bristol Reg'l*, 7 F.4th at 483.

The panel wholly disregarded principles of traditional rational-basis review, notwithstanding this Court's recent and clear holdings that those principles apply to abortion regulations. *See, e.g.*, *id.*; *EMW*, 978 F.3d at 439-40. This dangerous precedent warrants review by the full Court.

## III. This Case Presents an Exceptionally Important Question.

Since it upheld the preliminary injunction on other grounds, the panel did not reach Plaintiffs' argument that the medical-emergency affirmative defenses are unconstitutionally vague. Op. 33. But the district court held itself bound by

*Voinovich* to enjoin the laws for that additional reason. PI Opinion, R.41, PageID#764-66. This case thus presents an opportunity to reexamine *Voinovich*.[3]

As relevant here, *Voinovich* involved a vagueness challenge to medical-necessity and medical-emergency exceptions requiring a doctor to determine "in good faith and in the exercise of reasonable medical judgment" that the abortion was medically necessary or that a medical emergency existed. 130 F.3d at 204. *Voinovich* held that "the combination" of the subjective good-faith standard with the objective reasonableness standard "without a scienter requirement" rendered the exceptions "unconstitutionally vague," because a doctor "who believed he or she was acting reasonably" could be held liable if "others later decide that the physician's actions were nonetheless unreasonable." *Id.* at 205.

*Voinovich* relied heavily on the Supreme Court's decision in *Colautti*. *Id.* at 204. *Colautti* held that a law requiring a physician to make a viability determination was unconstitutionally vague because it was "unclear whether the statute import[ed] a purely subjective standard" or instead a "mixed subjective and objective standard." 439 U.S. at 391. That the law lacked a scienter requirement and imposed strict liability for erroneous viability determinations "compounded" its vagueness. *Id.* at

---

[3] Even if this Court declines to overrule *Voinovich*, the preliminary injunction was still improper because, among other reasons, *Voinovich* is distinguishable, facial challenges based on the lack of a valid medical-emergency provision are not permitted, and any vagueness in the medical-emergency provisions is easily eliminated through severance. *See* Appellants' Brief at 31-36.

394.  *Voinovich* acknowledged that *Colautti* "did not consider whether a mixed standard would be unconstitutional," but nevertheless "f[ound] *Colautti* strongly indicative of the [Supreme] Court's view that in this area of the law, scienter requirements are particularly important."  130 F.3d at 204-05.

*Voinovich* has been rightly and roundly criticized.  Judge Boggs called the panel's reliance on *Colautti* "misplaced" since the Supreme Court had "specifically declined" to consider whether a scienter requirement was constitutionally required.  *Id.* at 216 (Boggs, J., dissenting).  Justice Thomas, joined by Chief Justice Rehnquist and Justice Scalia, similarly criticized *Voinovich* for imposing a "constitutional scienter requirement . . . under the guise of the void-for-vagueness doctrine" and found the challenged Ohio laws, which "plainly impose[d] both a subjective and objective mental requirement," easily distinguishable from the "ambiguous" statute in *Colautti*.  *Voinovich v. Women's Med. Prof'l Corp.*, 523 U.S. 1036, 1348-49 (1998) (Thomas, J., dissenting from the denial of certiorari).  And the Seventh Circuit expressly disagreed with *Voinovich*, refusing to read *Colautti* to require the invalidation of an abortion statute containing an objective standard but no scienter requirement.  *Karlin*, 188 F.3d at 462-63; *see also Hope Clinic v. Ryan*, 195 F.3d 857, 866 (7th Cir. 1999) (en banc) (Easterbrook, J.).

This Court should grant en banc review to reconsider and overrule *Voinovich*.  There is nothing "vague, or even novel, about a statute prescribing a standard

including components of good faith and reasonableness." *Voinovich*, 130 F.3d at 216 (Boggs, J., dissenting). *Voinovich*'s holding to the contrary misconstrued *Colautti* and other vagueness precedents and warrants correction.

## CONCLUSION

This Court should grant the petition for rehearing en banc.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

ANDRÉE S. BLUMSTEIN
Solicitor General

/s/ Sarah K. Campbell
SARAH K. CAMPBELL
Associate Solicitor General

CLARK L. HILDABRAND
Assistant Solicitor General
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026

*Counsel for Defendants-Appellants*

September 23, 2021

**CERTIFICATE OF COMPLIANCE**

I certify that this petition complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 3,898 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This petition also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font.

/s/ Sarah K. Campbell
SARAH K. CAMPBELL
Associate Solicitor General

September 23, 2021

## CERTIFICATE OF SERVICE

I, Sarah K. Campbell, counsel for Defendants-Appellants and a member of the Bar of this Court, certify that, on September 23, 2021, a copy of Defendants-Appellants' Petition for Rehearing En Banc was filed electronically through the appellate CM/ECF system. I further certify that all parties required to be served have been served.

/s/ Sarah K. Campbell
SARAH K. CAMPBELL
Associate Solicitor General

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0215p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

MEMPHIS CENTER FOR REPRODUCTIVE HEALTH;
PLANNED PARENTHOOD OF TENNESSEE AND NORTH
MISSISSIPPI; KNOXVILLE CENTER FOR REPRODUCTIVE
HEALTH; FEMHEALTH USA, INC., d/b/a carafem; DR.
KIMBERLY LOONEY; DR. NIKKI ZITE,

                 *Plaintiffs-Appellees,*

    *v.*

HERBERT H. SLATERY, III; LISA PIERCEY, M.D.; RENE
SAUNDERS, M.D., W. REEVES JOHNSON, JR., M.D.;
AMY P. WEIRICH; GLENN R. FUNK; CHARME P. ALLEN;
TOM P. THOMPSON, JR.,

                 *Defendants-Appellants.*

> No. 20-5969

———————————

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:20-cv-00501—William Lynn Campbell, Jr., District Judge.

Argued: April 29, 2021

Decided and Filed: September 10, 2021

Before: DAUGHTREY, MOORE, and THAPAR, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Sarah K. Campbell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants. Rabia Muqaddam, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Appellees. **ON BRIEF:** Sarah K. Campbell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants. Rabia Muqaddam, Jessica Sklarsky, Jen Samantha D. Rasay, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, Thomas H. Castelli, AMERICAN CIVIL LIBERTIES UNION, Nashville, Tennessee, Susan Lambiase, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, Brigitte Amiri, Andrew Beck, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellees. David E. Fowler,

CONSTITUTIONAL GOVERNMENT DEFENSE FUND, Franklin, Tennessee, Michelle K. Terry, AMERICAN CENTER FOR LAW & JUSTICE, Franklin, Tennessee, Edward L. White III, AMERICAN CENTER FOR LAW & JUSTICE, Ann Arbor, Michigan, Mathew W. Hoffman, ALLIANCE DEFENDING FREEDOM, Ashburn, Virginia, John J. Bursch, ALLIANCE DEFENDING FREEDOM, Washington, D.C., S. Chad Meredith, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Priscilla J. Smith, YALE LAW SCHOOL, Brooklyn, New York, Sarah A. Hunger, OFFICE OF THE ILLINOIS ATTORNEY GENERAL, Chicago, Illinois, Janice Mac Avoy, Alexis R. Casamassima, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York, Rachel Thorn, Marc Suskin, Caroline Pignatelli, Kaitland Kennelly, Ashlesha Srivastava, Allison Kutner, COOLEY LLP, New York, New York, Darina Shtrakhman, COOLEY LLP, San Francisco, California, Kelly M. Dermody, Tiseme G. Zegeye, Nigar A. Shaikh, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, San Francisco, California, Carles Anderson, SISTERREACH, Memphis, Tennessee, Zachary W. Martin, Boston, Massachusetts, Geoffrey M. Wyatt, Washington, D.C., Jon Greenbaum, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., Melissa Cassel, O'MELVENY & MYERS LLP, San Francisco, California, Zhao Liu, O'MELVENY & MYERS LLP, Washington, D.C., Stuart M. Sarnoff, Christopher P. Burke, O'MELVENY & MYERS, New York, New York, for Amici Curiae.

DAUGHTREY, J., delivered the opinion of the court in which MOORE, J., joined. THAPAR, J. (pp. 36–70), delivered a separate opinion concurring in judgment in part and dissenting in part.

————————————

## OPINION

————————————

MARTHA CRAIG DAUGHTREY, Circuit Judge.  In the early hours of June 19, 2020, the last day of the Tennessee General Assembly's session, the state legislature passed one of the strictest abortion regulations in the country, House Bill 2263.  There are two provisions of the Act at issue in this appeal.  Section 216 criminalizes the performance of pre-viability abortions at cascading intervals of two to three weeks, beginning with the detection of a "fetal heartbeat" and continuing through a gestational age of 24 weeks.  The scheme provides that if any earlier restriction is found to be invalid, the others remain in effect.  Section 217 criminalizes the performance of an abortion if the physician "knows" the reason for the abortion is "because of" the race, sex, or a Down syndrome diagnosis of the fetus.  Both sections contain an affirmative-defense provision when the abortion was performed because, "in the physician's good faith, reasonable medical judgment," the abortion was necessary to avoid a medical emergency.

Plaintiffs—four reproductive-health centers and two physicians, suing on behalf of themselves and their patients—challenged the constitutionality of sections 216 and 217 and requested a preliminary injunction. They argued that both sections 216 and 217 substantively violate the Due Process Clause of the United States Constitution as an undue burden on pre-viability abortions, that section 217 is also void for vagueness, and that the medical-emergency affirmative-defense provisions are insufficient because they are unconstitutionally vague. The district court evaluated the submitted declarations and arguments and determined that the plaintiffs were likely to succeed on the merits of their claims. The court issued a preliminary injunction banning implementation of sections 216 and 217 but declined to address the substantive due process challenge to section 217 because it found that the section was unconstitutional under the void-for-vagueness doctrine. The State[1] now appeals the issuance of the preliminary injunction, including the legal conclusions and factual findings on which it is based, and asks us to address, in the first instance, whether section 217 violates substantive due process principles. Because access to pre-viability abortion is a constitutionally protected right, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs—Memphis Center for Reproductive Health, Planned Parenthood of Tennessee and North Mississippi, Knoxville Center for Reproductive Health, FemHealth USA, Inc., and Drs. Kimberly Looney and Nikki Zite on behalf of themselves and their patients—challenge two provisions of Tennessee House Bill 2263/Senate Bill 2196 (H.B. 2263) that impose bans or restrictions on certain pre-viability abortions.

**Tennessee General Assembly Enacts House Bill 2263**

The Tennessee General Assembly enacted H.B. 2263 in the early hours of June 19, 2020, with the intention of restricting pre-viability abortions; Tennessee has long prohibited abortions after viability. Tenn. Code Ann. §§ 39-15-201(b)(1), -211(b), -212(a). The challenged

---

[1]The State, collectively, includes Attorney General Herbert H. Slatery III; Dr. Lisa Piercey, Commissioner of the Tennessee Department of Health; Dr. Rene Saunders, Chair of the Board for Licensing Health Care Facilities; Dr. W. Reeves Johnson, Jr., President of the Tennessee Board of Medical Examiners, and several local District Attorneys.

provisions, sections 216 and 217, expose healthcare providers to criminal sanctions for performing abortions at certain gestational stages or for certain reasons.

Under section 216, it constitutes a Class C felony for a physician to perform an abortion on a patient[2] at specified "gestational ages,"[3] all of them pre-viability. A Class C felony is punishable by three to 15 years of imprisonment and a fine of up to $10,000. Tenn. Code Ann. § 40-35-111(b)(3). The Act criminalizes abortion upon the detection of a "fetal heartbeat,"[4] § 216(c)(1); at six weeks, § 216(c)(3); at eight weeks, § 216(c)(4); and so on, at various intervals, through 24 weeks, § 216(c)(12).

Section 217 makes it a Class C felony to perform, induce, or attempt to perform or induce an abortion if the physician "knows that the woman is seeking the abortion because of" the sex of the fetus, § 217(b); the race of the fetus, § 217(c); or "a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome," § 217(d).

Both sections 216 and 217 include an "affirmative defense" provision that applies to physicians that perform, induce, or attempt to perform or induce an abortion because of a medical emergency where certain conditions are satisfied. § 216(e)(1)-(2); § 217(e)(1)-(2). The provisions state that "it is an affirmative defense to criminal prosecution for a violation of a provision of this section that, in the physician's reasonable medical judgment, a medical emergency prevented compliance with the provision." § 216(e)(1); § 217(e)(1). It requires that the physician certify in writing that in their "good faith, reasonable medical judgment, . . . compliance with the provision was prevented by a medical emergency." § 216(e)(2)(A); § 217(e)(2)(A). "Medical emergency" is defined as

---

[2]We use the word "patient" or "person" instead of "woman" where possible, to be inclusive of transgender and non-binary individuals, who also can become pregnant.

[3]The gestational ages in the statute apparently measure time from conception. As it turns out, the medical terminology used to calculate the expected date of delivery measures time in the uterus from the first day of a patient's last menstrual period (LMP), a calculation more accurately made than the time of conception. As a result, six weeks of "gestational age" would correspond approximately to eight weeks LMP.

[4]Although the statute refers to the "fetal heartbeat," one expert explained that "early cardiac activity" is a more appropriate term because at the developmental stage in question, there is not yet a cardiovascular system. So, what is termed a "heartbeat," at that stage, is simply a group of cells with electrical activity.

a condition that, in the physician's good faith medical judgment, based upon the facts known to the physician at the time, so complicates the woman's pregnancy as to necessitate the immediate performance or inducement of an abortion in order to prevent the death of the pregnant woman or to avoid a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman that delay in the performance or inducement of the abortion would create.

Tenn. Code Ann. §§ 39-15-216(a)(4); 39-15-211(a)(3).  The statute specifically excludes a claim or diagnosis related to the woman's mental health.  § 216(a)(4).

Both sections 216 and 217 contain a severability clause.  Pursuant to those clauses, if any provision of the section is found to be unenforceable, the other enforceable provisions shall remain intact.  § 216(h); § 217(i).

**Plaintiffs challenge the constitutionality of sections 216 and 217 of H.B. 2263**

On the day H.B. 2263 was passed, the plaintiffs filed a complaint in the United States District Court for the Middle District of Tennessee alleging that sections 216 and 217 are unconstitutional because they ban pre-viability abortions in violation of Fourteenth Amendment's substantive-due-process provisions and lack a valid medical-emergency exception, and also because section 217 is unconstitutionally vague and thus violative of the plaintiffs' procedural due process rights.  They sought a temporary restraining order and/or a preliminary injunction.

**Plaintiffs' Declarants**

In support of their motion for injunctive relief, the plaintiffs filed declarations from Dr. Kimberly Looney, Dr. Mary Norton, Dr. Nikki Zite, Corinne Rovetti, FNP, APRN-BC, Rebecca Terrell, and Melissa Grant.

Looney is a board-certified obstetrician and gynecologist who serves as the Chief Medical Officer of Planned Parenthood Tennessee and North Mississippi (PPTNM).  PPTNM is a not-for-profit organization that operates four health centers in Tennessee—one in Nashville, one in Knoxville, and two in Memphis.  Among a wide-range of women's health and reproductive health services, PPTNM provides medication abortions through 11-weeks from the first day of a patient's last menstrual period (LMP), and two of the four centers provide surgical

abortions through 19-weeks, 6-days LMP. Looney expressed concerns that H.B. 2263 "will effectively eliminate access to abortion care in Tennessee" and "will result in significant and irreparable medical, emotional, and other harms to [ ] patients and have a significant chilling effect on providers."

Norton is a professor and licensed perinatologist and is board-certified in obstetrics and gynecology, clinical genetics, and maternal-fetal medicine, with a focus on high-risk pregnancies. She expressed concern about what she believes to be misleading, unsupported, or inaccurate findings underlying H.B. 2263.

As a board-certified obstetrician and gynecologist and a professor, Zite's experience involves providing pre-viability abortions in the hospital when the patient or fetus is in grave circumstances. Her practice is not based in one of the plaintiffs' centers, but she works with patients with fetal health conditions and is concerned about the "inhumane and dangerous" results of forcing people with very serious health conditions to carry pregnancies to term.

Rovetti, a family nurse practitioner and co-director of the Knoxville Center for Reproductive Health, also submitted a declaration stating that section 216's bans effectively will prohibit all abortions at the Knoxville Center.

Terrell is the executive director of CHOICES, which provides a full spectrum of reproductive healthcare, including abortion up to 16-weeks LMP, mostly for low-income patients. In her declaration, Terrell said that CHOICES provided 2,651 patients with an abortion "for a variety of medical, familial, financial, and personal reasons" in 2019 alone.

Grant is the chief operations officer of FemHealth U.S.A.—a nonprofit that provides women's reproductive health services with a location in Mount Juliet, Tennessee. FemHealth provides abortions up to 14-weeks LMP. Grant said that implementation of section 216 "will make it impossible" to continue providing pre-viability abortion care to most of FemHealth's patients.

The consensus reflected in the plaintiffs' declarants is that H.B. 2263 would result in a complete ban on pre-viability abortions and that the Act incorrectly defines the term "viability."

For example, Looney explained that "[n]o fetus is viable at 20-weeks LMP or at any earlier gestational age." Moreover, "[v]iability is not the same for every pregnancy," but must be determined "by a trained medical professional on a case-by-case basis." In fact, "some fetuses are never viable." Although there are rare exceptions when infants born between 21.4 and 23 weeks have survived, Norton has attested that those situations "are outliers that do not reflect a reasonable likelihood of sustained survival outside of the womb." Even those infants born at 24-weeks LMP survive only 5-6% of the time, so most medical centers do not mandate resuscitation for births before that time. Additionally, according to Norton, "the very factors that lead some patients to seek abortion after the twentieth week of pregnancy—such as fetal and maternal health conditions—can significantly reduce or eliminate the likelihood of survival for the fetus." Thus, according to the plaintiffs' declarants, many factors contribute to the viability of a fetus, not just gestational age.

The vast majority of the plaintiffs' patients would be barred completely from accessing abortion in Tennessee under section 216. In 2019, PPTNM performed 4,742 abortions, 98% of which were at or after six-weeks LMP; approximately 95% of the Knoxville Center's patients underwent abortion after six-weeks LMP; and at CHOICES, only 4.9% of patients received abortions prior to six-weeks LMP. Although patients tend to "seek abortion as early in their pregnancy as they can," people have menstrual cycles of different lengths—and for a person with a "regular monthly period, fertilization typically occurs at two-weeks LMP." So, even for a "person with a highly regular, four-week cycle," six-weeks LMP is merely two weeks after a missed period. Those individuals with more irregular cycles may have even less time to seek an abortion under the restrictions of the section 216. "If abortion is banned after six-weeks LMP, this patient would have at most two weeks to learn they are pregnant, confirm that the pregnancy is in the uterus, decide whether to have an abortion, and seek and obtain abortion care." Many patients who seek an abortion later in their pregnancies do so because negative maternal health conditions have arisen during pregnancy or have worsened or because newly diagnosed medical conditions cannot be treated effectively without risking harm to the fetus. But patients also seek abortion care later in pregnancies because of fetal diagnoses that are not discovered until 15-to-20-weeks LMP. These patients often seek genetic counseling to help them make the decisions that are best for them and their families prior to seeking an abortion.

Seventy-five percent of abortion patients nationwide are classified as poor or low income.[5]  The majority of the patients of the plaintiffs' agencies are economically disadvantaged and persons of color.  Those patients faced substantial obstacles in obtaining abortion care even prior to the bans enacted pursuant to section 216.  In addition to the substantial financial obstacles such as finding childcare or taking time from work, many abortions sought by survivors of rape, incest or abuse are delayed because of the time necessary to cope with the additional trauma.  Because of these logistical challenges, were H.B. 2263 allowed to take effect, most of the plaintiffs' patients would be forced to carry a pregnancy against their will—"robbing them of the ability to direct their own futures" and forcing others to "resort to unsafe means to terminate their pregnancy."

Furthermore, Looney, Rovetti, Terrell, and Grant noted in their declarations the problems with the language of section 217 that makes it illegal to perform an abortion if the physician "knows" it is sought "because of" the race, sex, or Down syndrome diagnosis of the fetus.  They question whether the legislature intended that one of listed reasons must be "the only reason, the main reason, one of many reasons, or simply a factor."  "It also could be interpreted differently for different physicians or by different officials."  Because the race, sex, or genetic condition of the fetus may come up at some point during client counseling by providers, it is unclear whether the patient's mere mention of the banned factor precludes them from providing an abortion to that patient.  Under Dr. Zite's hospital's policy, for example, she does not perform any terminations for pregnancies based solely on a Down syndrome diagnosis, but "[a]bortion may be offered if there are significant additional findings noted on an ultrasound."  It is unclear to her whether such abortions would be considered "because of" a Down syndrome diagnosis and thus criminalized under § 217.  As a result, the statute's bans would criminalize "all the abortion care [she] provide[s] at her hospital unless it qualifies as a 'medical emergency'" and, even then, the reach of the statute raises serious concerns regarding the doctor's criminal liability.

---

[5]Citing Guttmacher Inst., *Abortion is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates* (Oct. 19, 2017), https://www.guttmacher.org/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates (last visited Apr. 12, 2021).

According to the plaintiffs' declarants, individuals seek abortions for a variety of reasons but, regardless, the declarants provide "non-directive patient counseling," during which they "listen to, support, and inform their patients, without directing their course of action" to make sure "that patients are well-informed with respect to all their options." That counseling does not require patients to disclose their reasons for seeking abortions, although many do. The declarants agree that reasons for terminating a pregnancy are often complex and multi-faceted, and even with comprehensive, open-ended patient counseling, it is "challenging, if not impossible" to determine a patient's true reasons for terminating a pregnancy. Section 217 will inhibit the amount of counseling the plaintiffs are able to give their patients to ensure they are confident in their decision to terminate. Because of the vagueness inherent in section 217 and the severe penalties associated with violations of the section, the ban will "undermine the central feature of a healthy, effective patient-provider relationship: trust," and providers will be forced "to assume the most aggressive reading of the statute."

The plaintiffs' declarants further stated that if the bans are permitted to take effect, they would ultimately be forced to stop providing any pre-viability abortions to avoid criminal, financial, and medical-licensure penalties. Even in a medical emergency, the physicians would be hesitant to provide the necessary care because the affirmative defense is rife with uncertainty as to whether others would deem the physician's "good faith medical judgment" as "reasonable" after the fact. This is particularly concerning because "medical emergency situations are often complex and easily subject to disagreement," particularly "in Tennessee where there is such open hostility to abortion and abortion providers." This uncertainty may very well lead to an "inappropriately delayed" decision that puts "the patient's long-term health in serious jeopardy." The intimidation of criminal penalty also may result in the deterioration of a person's health to the point that the abortion becomes immediately necessary.

**The State's Declarants**

In opposition to the plaintiffs' motion, the State filed declarations from Dr. Farr A. Curlin, Dr. Dennis M. Sullivan, O. Carter Snead, Amelia Platte, Dana Bythewood, Maureen L. Condie, Dr. Robin Pierucci, and Vanessa Lefler.

Curlin, a bioethicist and an internist with a sub-specialty in hospice and palliative medicine, challenged the premise that abortion is a common and safe medical procedure. His declaration discussed his belief concerning the ethics of abortion, that abortion "kills a human being" and that the procedure "often involves unjustified discrimination." Thus, he said, allowing abortions will damage the perceived integrity of the medical community. He expressed concern that healthcare has moved from a "traditional ethic" to "a providers-of-services model" for the sake of patients' "well-being," where "well-being is subjectively defined and understood principally in terms of satisfying the patients' wishes." He complained that this model "has led to moral detachment by clinicians[,] [r]ather than using their best judgment to pursue the patient's health." As a result, Curlin deemed section 216's provisions reasonable based on ethical concerns, moral status, and the risks late-term abortions carry for women.

Sullivan, a general surgeon, bioethicist, and pharmacist, expressed "concern that recent developments in prenatal testing have led to justifications for induced abortion where certain genetic abnormalities are found." *Memphis Ctr. for Reproductive Health v. Slatery*, No. 3:20-cv-00501, slip op. at 17 (M.D. Tenn. July 24, 2020) (order issuing a preliminary injunction). According to Sullivan, Down syndrome is the most common chromosomal abnormality, and "between 61% and 91% of [women] choos[e] abortion when [it] is discovered on a prenatal test." He stated that such a rate of abortion has resulted in a 30% reduction of the Down-syndrome community and a bias within the medical community against giving birth to infants with Down syndrome.

Snead, an attorney and professor of bioethics and medical ethics, discussed the circumstances that gave rise to the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. He relies on those circumstances—and the laws governing protections for human subjects of federally-funded research—to argue that "unborn children . . . have interests that must be respected and honored." He believes that sections 216 and 217 will prevent vulnerable populations from being subjected to discrimination and cruel, inhumane, and degrading treatment. *Memphis Ctr.*, slip op. at 18.

Platte and Blythewood are Tennessee residents who recounted their experiences with healthcare providers while pregnant with a Down syndrome diagnosis. They explained that the

providers focused on the negative aspects of the diagnosis, provided outdated information, and offered or encouraged the option of terminating their pregnancies. Both women opted to continue with their pregnancies and now have "happy and healthy" children. *Memphis Ctr.*, slip op. at 18-19.

Condic is a professor specializing in issues concerning human embryology, science policy, and ethics, and focuses on research around fetal pain. She stated that it is universally accepted that at 10-to-12-weeks LMP, a human fetus is "capable of detecting and responding to pain." What is debatable, she adds, is whether there is a conscious experience of pain. She declared that, at 14-to-20-weeks LMP, a fetus is "capable of supporting a conscious awareness of pain," but she acknowledged that two major reviews of scientific literature on fetal pain have determined "that the fetus does not experience pain in a meaningful sense during the first two trimesters." Nevertheless, she reiterated her belief that evidence does not support such a conclusion. She also disputed the plaintiffs' declarations on viability by pointing out that between 23% and 60% of infants born at 22-weeks LMP survive if they receive active hospital treatment.

Pierucci, board-certified in pediatrics and neonatology, agreed with Condic's contentions that evidence does not support the denial of the existence of fetal pain. And, although she agreed with the plaintiffs' declarants that gestational age is not the only variable that determines viability, she contended that the "edge of viability" has decreased to approximately 22-to-23 weeks, even while conceding that gestational ages and fetal diagnoses often are determined incorrectly.

**Rebuttal Declarations**

By way of reply, the plaintiffs filed supplemental declarations from Drs. Looney and Norton, along with declarations from two additional individuals: Steven J. Ralston, M.D., M.P.H., and Owen Phillips, M.D., M.P.H..

Phillips, a board-certified obstetrician/gynecologist and reproductive geneticist, specializes in testing for fetal genetic conditions and therefore has substantial experience counseling pregnant patients. He explained that there are many ways genetic testing and

counseling benefit patients: these practices help patients feel less anxious about potential outcomes, prepare them for a series of undertakings to ensure a successful pregnancy and delivery, allow them to arrange for delivery in a hospital equipped to handle any possible complications particular to their situation, and help them make preparations for their child, gather finances, and explain the condition to their existing children. Ralston, a board-certified obstetrician/gynecologist with a specialty in medical ethics, agreed with Phillips and Norton that, contrary to the inferences made by the State's declarants Curlin and Sullivan, prenatal genetic screening, testing, and counseling are not used simply to explore the possibility of abortion or to pressure patients into seeking abortion. Citing the American Medical Association's Code of Medical Ethics, Phillips and Ralston disagreed with the assertions of the State's declarants that bias and coercion are prevalent in patient counseling following a fetal diagnosis of Down syndrome. Recognizing that history is replete with instances of "reprehensible treatment of individuals with disabilities," Phillips nevertheless believes that the examples in the State's declarations "do not reflect the current state of medical care." "Dr. Ralston state[d] that in his own practice and in training other physicians, he follows the recommendations of leading authorities on medical ethics to engage in a non-directive, non-judgmental approach to patient treatment and counseling." *Memphis Ctr.*, slip op. at 23.

Ralston also refuted Condic's comments on fetal pain, indicating that fetuses cannot "feel pain before at least 24-weeks LMP because key connections to the brain do not develop before that time." He further contended—based on his own research and the research of leading experts in various disciplines—that fetuses never experience pain in utero. "Where anesthesia [ ] is administered to a fetus for fetal surgery and procedures, … it is done to prevent fetal movement, not to ensure a fetus remains unconscious or to reduce pain." *Memphis Ctr.*, slip op. at 23.

Norton's rebuttal also disagreed with the State's positions on viability, counseling, abortion safety, and medical ethics. She reiterated that viability is determined by a variety of factors in addition to gestational age and that claims of fetal viability at 22-to-23-weeks LMP are not supported by current medical research. She further took issue with assertions that abortion care poses significant risks to patients' physical or mental health. A comprehensive review of research shows that the "mainstream consensus in the field" is that mental-health issues for

people with unwanted pregnancies were the same for those that had an abortion and those who gave birth. Also, research shows that abortion does not increase a person's risk of mental-health disorders.

Looney's rebuttal declaration reiterated that her patients would no longer be able to access abortion for one of section 217's prohibited reasons even if they do not disclose their reasons to the provider, because patients' files still may reflect either a Down syndrome diagnosis or the fact that the patient inquired about the sex of the fetus. Once a patient has learned of such information, she said, "she would be forced to assume the patient had accounted for such a factor in making her decision, and would not be able to provide an abortion." *Memphis Ctr.*, slip op. at 24.

**The District Court issues a Preliminary Injunction and the State appeals**

On July 24, 2020, 11 days after issuing a temporary restraining order, the district court issued an injunction on the filings alone. *Memphis Ctr.*, slip op. at 1. Based on the application of "binding Supreme Court precedent and the factors required for the extraordinary relief of an injunction," the district court concluded that an injunction was warranted. Finding that the Supreme Court prohibited all-encompassing bans on pre-viability abortions, the district court determined that section 216's "heartbeat and gestational-age bans" constituted violations of substantive due process rights. *Id.* at 31. In addressing arguments that section 217 was unconstitutionally vague, the district court adopted the concerns of the plaintiffs' declarants: because the terms "know" and "because of" "lead to several pivotal questions," they "make it impossible for a person of ordinary intelligence to know what conduct constitutes a crime." *Id.* at 34. Because the district court thus found section 217 void for vagueness, it declined to address the plaintiffs' substantive-due-process argument. *Id.* at 32-33. Finally, relying on *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 205 (6th Cir. 1997), the district court found that the medical-emergency defense was also unconstitutionally vague. *Id.* at 40.

The State sought a stay of the injunction pending appeal, which the district court denied. They then requested—and were granted—a partial stay of the preliminary injunction regarding section 217 from this court. *Memphis Center for Reproductive Health v. Slatery*, No. 20-5969,

(6th Cir. Nov. 20, 2020) (order).  The order declined the plaintiffs' request to address, in the first instance, whether section 217 operated as an unconstitutional ban on pre-viability abortions.  *Id.* at 4 n.1.  The plaintiffs then moved the district court for an emergency temporary restraining order followed by a preliminary injunction to stop the enforcement of section 217 as applied to pre-viability abortions, but the district court denied that request.

The State now appeals "from the district court's July 24, 2020[,] Order granting a preliminary injunction, including the legal conclusions and factual findings on which that Order is based."  In addition to the issues addressed by the district court—whether section 216 is an unconstitutional ban on pre-viability abortions, whether section 217 is unconstitutionally vague, and whether the medical-emergency affirmative defense is void for vagueness—the State also asks us to address, in the first instance, whether section 217 violates substantive due process principles.  The plaintiffs contend that this last issue is not properly before this court at this time.

## DISCUSSION

### Standard of Review

We review a district court's issuance of a preliminary injunction for an abuse of discretion.  *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018).  Thus, we may disturb the district court decision only if the decision "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard."  *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007)).  We may not reverse the district court's findings of fact even if we "would have weighed the evidence differently."  *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2121 (2020) (plurality) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).  But we review *de novo* the legal questions that underlie the district court's decision, such as whether the moving party was likely to succeed on the merits.  *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019).

We consider four factors when determining whether a motion for a preliminary injunction should have been granted: (1) whether the movant is likely to succeed on the merits of their claim; (2) whether there would be irreparable injury in the absence of an injunction; (3) whether

others would suffer harm because of an injunction; and (4) whether an injunction would serve the public interest. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (*en banc*) (citation omitted). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Id.* (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)) (additional citation omitted). Therefore, we first address the plaintiffs' likelihood of success on the merits of its challenges.

**Challenge to the Section 216 Pre-Viability Abortion Bans**

In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 878 (1992), the Supreme Court made clear that "viability" is "the relevant point at which a State may begin limiting women's access to abortion for reasons unrelated to maternal health." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2320 (2016) (affirming that the Court still applies that standard). "[A] State's abortion-related law is unconstitutional on its face if 'it will operate as a substantial obstacle to a woman's choice to undergo an abortion' in 'a large fraction of the cases in which [it] is relevant.'" *June Medical Servs. LLC v. Russo*, 140 S. Ct. 2103, 2132 (2020) (citing *Casey*, 505 U.S. at 895). In *Gonzales v. Carhart*, the Court continued to emphasize that "[u]nder the principles accepted as controlling," a statute is "unconstitutional 'if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" 550 U.S. 124, 156 (2007) (quoting *Casey*, 505 U.S. at 878). Because "before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure," the district court determined that the section 216 bans were prohibitions on pre-viability abortions and did not evaluate the State's interests. *Memphis Ctr.*, slip op. at 31 (quoting *Casey*, 505 U.S. at 846).

Our recent *en banc* decision suggested, however, that "[t]he right to an abortion before viability is *not* absolute"; thus, even when a regulation is characterized as a "ban" (as opposed to

No. 20-5969    *Memphis Center for Reproductive Health, et al. v. Slatery, et al.*    Page 16

a regulation)[6] and applies before viability, we still apply the undue-burden test.[7] *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 520 (6th Cir. 2021) (emphasis in original) (citing *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 443 (6th Cir. 2003); *Voinovich*, 130 F.3d at 193; *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 513-14 (6th Cir. 2012) (Moore, J. dissenting)). In so holding, it declared that "there is no absolute or *per se* right to an abortion based on the stage of the pregnancy" and, when a constitutional challenge is made, we are, apparently, required to apply the undue-burden test. *Id.* at 521.

The Supreme Court debated the undue-burden test in its most recent abortion case, *June Medical Services v. Russo*. There, the four-member plurality reinforced the balancing approach that they believed *Casey* laid out and that a majority in *Whole Women's Health* reiterated: courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *June Med. Servs.*, 140 S. Ct. at 2120 (quoting *Whole Woman's Health*, 136 S. Ct. at 2309; *Casey*, 505 U.S. at 887-98). Chief Justice Roberts's solo concurrence, on the other hand, asserted more of a binary test: "restrictions that [do] not impose a substantial obstacle [are] constitutional, while [ ] restriction[s] that [do] impose a substantial obstacle [are] unconstitutional." *Id.* at 2138 (Roberts, C.J. concurring). The Chief Justice also stated that

---

[6]The parties have opposing views on whether the Act is a "regulation" or a "ban," *see* Pl. Br. at 20, but *Preterm Cleveland* seemingly makes the debate irrelevant, stating that the undue-burden test is applied regardless of labeling. *But see, e.g.*, *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 960 F.3d 785, 795 (6th Cir. 2020), *petition for cert. filed*, No. 20-601 (Nov. 5, 2020) (explaining that "a State may not *prohibit* any woman from making the ultimate decision to terminate her pregnancy before viability," but "on the other hand, '*regulations . . .*'" must be adjudicated under the undue burden test) (emphasis added) (quoting *Casey*, 505 U.S. at 877, 879); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 274 (5th Cir. 2019) ("laws that limit certain methods of abortion or impose certain requirements on those seeking abortions are distinct under *Casey* from those that prevent women from choosing to have abortions before viability").

[7]This interpretation is, however, completely counter to Supreme Court and Sixth Circuit precedent. *Casey* stated that "[A]n undue burden *exists*, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path" of a person seeking abortion before viability. 505 U.S. at 878 (emphasis added). *Casey* did not state, nor did any later precedent declare, that a court must apply a *test* to determine whether there is an undue burden in those circumstances. This interpretation was artfully summarized by the Fifth Circuit in *Jackson Women's Health*, 945 F.3d at 274:

> In recognition of state interests, *Casey* allows restrictions on pre-viability abortions that are not an undue burden on a woman's right to elective abortion. The ban on partial-birth abortions in *Gonzales* is one example. But the Act is not such a restriction, so this legal principle, while valid, has no application here. *Casey* clarified that the "adoption of the undue burden analysis does not disturb the central holding of *Roe*": "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." This "central holding of *Roe*" is what the Act implicates here, as the State asks us to extend the undue-burden analysis past *Casey*'s clear demarcation.

*Casey*'s undue burden test does not involve examining an abortion regulation's benefits.  *Id.* at 2139.  In *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 978 F.3d 418, 431 (6th Cir. 2020), we applied *Marks v. United State*s, 430 U.S. 188, 193 (1977), to determine which *June Medical* approach constituted governing law.  We held that because Chief Justice Roberts's concurrence was the narrowest opinion, it controls.[8]  *Preterm Cleveland* affirmed this approach.  We are therefore obliged to make two evaluations of the challenged law as we determine whether a law regulating abortion is valid:

> First, it must be reasonably related to a legitimate state interest.  Because we are to apply the traditional rule of deference to the state's medical and scientific judgments, this requirement is met whenever a state has a rational basis to use its regulatory power.
>
> Second, the law must not have the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.

*EMW Women's Surgical Ctr*, 978 F.3d at 433-34 (internal citations and alterations omitted).

But notably, Chief Justice Roberts also emphasized that if a regulation creates a substantial obstacle to a woman seeking a pre-viability abortion, that finding constitutes a sufficient basis to invalidate the regulation.  *June Medical Servs.*, 140 S. Ct. at 2139.  Thus, it is still clear that when burdens are substantial enough, a law restricting access to pre-viability abortions is unconstitutional.  As a result, if either of the two requirements fail, the law in question is invalid.  Because we find that all provisions of section 216 pose a substantial burden to a person seeking an abortion at the relevant time LMP, it is unnecessary for us to fully address the State's interests.

### Substantial Burden Analysis of Section 216

"An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion *before the fetus attains viability*."  *Casey*, 505 U.S. at 878 (emphasis added).  The State argues here that the

---

[8]"Because all laws invalid under the Chief Justice's rationale are invalid under the plurality's, but not all laws invalid under the plurality's rationale are invalid under the Chief Justice's, the Chief Justice's position is the narrowest under *Marks*.  His concurrence therefore 'constitutes [*June Medical Services'*] holding and provides the governing standard here.'"  *EMW Women's Surgical Ctr.*, 978 F.3d at 433 (citation omitted).

"timing provisions" of section 216 do not pose a substantial obstacle because they do not deter people from procuring an abortion "as if the State had outlawed abortion in *all cases*."  Gov't Brief at 54 (quoting *EMW Women's Surgical Ctr.*, 978 F.3d at 434).  But this proposition takes our quote out of context and misconstrues it to apply here.

In *EMW Women's Surgical Center*, the plaintiffs challenged a Kentucky law that imposed new licensing requirements on abortion providers.  *Id.* at 423-24.  In determining whether it created a substantial obstacle, we had to evaluate only whether the abortion providers "would be able to operate with the provisions in effect."  *Id.* at 440.  Because they could in fact continue to operate if granted repeated 90-day waivers and because persons seeking pre-viability abortions still were able to obtain them at other facilities, it was not as though the State had outlawed abortion "in all cases."  *See id.*  This comports with the holding in *Gonzales* that found a restriction on the *method* of abortion was not an undue burden because "[a]lternatives [were] available to the prohibited procedure."  550 U.S. at 164.

Here, however, a person at 12-weeks LMP—the most common time a patient pursues an abortion at the plaintiffs' facilities—would be unable to obtain an abortion because under section 216(c)(5), it would in fact be outlawed "in all cases."  There would be no alternatives available.  In essence, the state is defining the "alternative" as simply getting an abortion earlier. Gov't Br. at 54 ("Nearly 13 percent of Tennessee residents who obtained abortions in the past decade did so before 6 weeks").  But this argument is unsound and misconstrues the "large fraction" analysis.  "Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . .  The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *Casey*, 505 U.S. at 894; *see also Isaacson v. Horne*, 716 F.3d 1213, 1227 (9th Cir. 2013) (noting that this kind of prohibition "does not merely 'encourage' women to make a decision regarding abortion earlier than Supreme Court cases require; it forces them to do so.").

In considering whether the provisions operate as a substantial obstacle for "a large fraction" of the relevant persons, if we were to define the denominator in the equation as all persons seeking abortions, that leaves 87 percent of them unable to get an abortion under section 216.  By any definition, that is a "large fraction."  But the large-fraction test actually

requires the denominator to be even smaller—it entails the persons for whom the restriction is *relevant*. *June Med. Servs.*, 140 S. Ct. at 2132-33.

> As we stated in *Casey*, a State's abortion-related law is unconstitutional on its face if "it will operate as a substantial obstacle to a woman's choice to undergo an abortion" in "a large fraction of the cases in which [it] is relevant." In *Whole Woman's Health*, we reaffirmed that standard. We made clear that the phrase refers to a large fraction of "those women for whom the provision is an actual rather than an irrelevant restriction." That standard, not an "every woman" standard, is the standard that must govern in this case.[9]

*Id.* (citations omitted). The State would have us define the relevant group as all women seeking an abortion and contends that because "nearly half of women" obtain abortions prior to eight-weeks LMP, the bans that begin at eight weeks do not pose a substantial obstacle for a "large fraction of women." Gov't Br. at 54. But the patients here "for whom the provision is an actual" restriction are those carrying pre-viability fetuses at the gestational age in question. *See June Med. Servs.*, 140 S. Ct. at 2132-33. Accordingly, a complete ban on abortions for anyone ten-weeks LMP is a "substantial burden" for 100% of persons ten-weeks LMP—even with an approach that "treat(s) the large-fraction test as 'more conceptual than mathematical.'" *Preterm-Cleveland*, 994 F.3d at 535 (Batchelder, J. concurring) (citations omitted). Exact numbers are unnecessary to reach this logical conclusion.[10]

The State is unable to argue its way around the plain and simple interpretation of section 216 as banning abortions before viability, and "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879. The State goes to great lengths to show that a fetus *might* be viable at "less than 22 weeks," making clauses ten through twelve (banning abortions at 22-to-24 week LMP) "post-viability." But the district court weighed competing testimony and properly rejected the State's contentions. *Memphis Ctr.*, slip op. at 30. We do not disturb such a factual finding absent clear error.

---

[9] The "large fraction" test is not addressed in Chief Justice Roberts's concurring opinion; thus, the plurality's treatment of the test is controlling.

[10] Nonetheless, 73% of patients get abortions after six-weeks LMP, and more than half after eight-weeks LMP, so those provisions fail even if the population is defined as all pregnant persons seeking an abortion.

> [I]t is not the proper function of the legislature or the courts to place viability, which essentially is a medical concept, at a specific point in the gestation period. The time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician.

*Colautti v. Franklin*, 439 U.S. 379, 388 (1979) (quoting *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 64 (1976)); *see also MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772-73 (8th Cir. 2015) (finding that a heartbeat ban is unconstitutional because courts "are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions").

With that in mind, "a substantial burden" is an understatement when addressing any gestational-age-dependent regulations that leave a person with no alternatives at a certain point in time. Thus, there is no provision of section 216—from the detection of a fetal heartbeat through 24-weeks LMP—that survives the undue-burden test. *See Colautti*, 439 U.S. at 388-89 ("[N]either the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus"); *see also Jane L. v. Bangerter*, 102 F.3d 1112, 1116–17 (10th Cir. 1996) (finding that the State impermissibly defined viability and banned abortion at 22-weeks LMP, thus choosing "to ignore the Supreme Court's repeated directive that viability is a matter for an attending physician to determine").

Although *Preterm-Cleveland* held that "there is no absolute or *per se* right to an abortion based on the state of the pregnancy" and that the undue-burden test must be applied in all cases, 994 F.3d at 521, any law that outright criminalizes *all kinds* of abortion at *any* stage pre-viability poses more than a substantial obstacle, it creates an impossibility. And under the test laid out by Chief Justice Roberts, if there is a substantial burden, we need not "balance" the burden with any state interest. *EMW Women's Surgical Ctr*, 978 F.3d at 433-34 (citing *June Med. Servs.*, 140 S. Ct. at 2138 (Roberts, C.J. concurring)).

Finally, the State argues that its purported interests go beyond ones that "were actually at issue in *Casey*" and, therefore, that "the Supreme Court could not possibly have 'carefully balanced' interests that were not before it." In particular, they ask us to draw a

distinction at 15-weeks LMP, because their experts declare—contrary to mainstream scientific understanding—that a fetus can begin experiencing pain at that time.  There are several reasons this argument is unsound.  First, this reasoning does not change the fact that a prohibition of abortion at 15-weeks LMP is a substantial burden for a person seeking abortion at 15-weeks LMP.  Second, the Supreme Court has specified that "'viability' is the relevant point at which a State may begin limiting access to abortion *for reasons unrelated to maternal health*," meaning that the State's other interests are of no consequence pre-viability.  *Whole Woman's Health*, 136 S. Ct. at 2320 (emphasis added).  And last, as Chief Justice Roberts explained in his concurrence, there is no need to balance state interests if there is in fact a "substantial burden." *June Medical Servs.*, 140 S. Ct. at 2138; *see Preterm-Cleveland*, 994 F.3d at 524-25.

But even if we were to consider the State's interests, as they request, there are questions about whether their declared reasons for the law are, in fact, genuine.  In legislative committee meetings, Representative Jerry Sexton, Chairman of the Subcommittee on Public Health, made clear that the reason behind the bill was not "a law issue" but "a moral issue."[11]  Importantly, Chairman Sexton—in responding to a statement by the President of the Family Action Council of Tennessee that the Act would be unconstitutional—declared that the purpose behind the bill was "about overturning *Roe v. Wade* the right way" with "the right formula."[12] [13]  The State does not raise this questionable motivation as their "reasonable" rationale, but they do not hide it:  the State proposes that if this court does find the law unconstitutional under the *Casey* framework, "that is a sure sign that the framework needs to be revisited."  Gov't Br. at 55.  Such a bold

---

[11]Meeting on H.B. 2263 before the H. Subcomm. on Pub. Health, 111th General Assembly (Tenn. May 27, 2020) (statement by Rep. Jerry Sexton, Chair, H. Subcomm. on Pub. Health), http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=23005 (at 00:13:00).

[12]Meeting on H.B. 2263 before the H. Subcomm. on Pub. Health, 111th General Assembly (Tenn. May 27, 2020) (statement by Rep. Jerry Sexton, Chair, H. Subcomm. on Pub. Health), http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=23005 (at 00:13:45).

[13]Notably, the 111th Tennessee General Assembly, in 2019, passed a law to outlaw abortion in any circumstances as soon as constitutionally permissible.  Tenn. Code Ann. § 39-15-213.

approach would force us to ignore not only the principle of *stare decisis* but also our duty to follow Supreme Court precedent.[14]

The Supreme Court has been clear that laws that have the *purpose* or effect of placing an obstacle in the path of a woman seeking abortion "cannot be considered a permissible means of serving its legitimate ends." *See Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877); *see also Jane L.*, 102 F.3d at 1116 (declaring an abortion provision unconstitutional where the "legislature's intent in passing the [ ] provisions was to provide a vehicle by which to challenge *Roe v. Wade*"). This legislative history indicates a likelihood that the justifications offered in court have been mere pretext and that the bill was passed with knowledge that it was unconstitutional.

Although "the State may use its regulatory power to bar certain procedures," it may do so only when it provides other options and "it has a rational basis to act." *Gonzales*, 550 U.S. at 158. It thus is likely that the plaintiffs would succeed on the merits in demonstrating that section 216 is unconstitutional because it is in direct violation of the principles established in *Roe* and *Casey*.

## The "Reason" Bans of Section 217

Finding that section 217 of H.B. 2263—the "anti-discrimination provision"—could result in varied interpretations that would result in criminal sanctions, the district court held that there was a substantial likelihood that it is unconstitutionally void for vagueness. *Memphis Ctr.*, slip op. at 35. Section 217 criminalizes the performance of an abortion "if the [doctor] knows" that the abortion is being sought "because of" the sex or race of the fetus, or "because of" a prenatal diagnosis, test, or screening indicating Down syndrome. § 217 (b)-(d).

---

[14]"For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. These considerations do not answer the question before us, however. The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. 'Our obligation is to define the liberty of all, not to mandate our own moral code.'" *Lawrence*, 539 U.S. at 571 (quoting *Casey*, 505 U.S. at 850).

*Preterm-Cleveland* addressed a similar Ohio law criminalizing the performance of an abortion "if the [doctor] has knowledge" that the patient sought abortion "in whole or in part, because of" a Down syndrome diagnosis. 994 F.3d at 517-19. Under the Ohio statute:

> No person shall purposely perform or induce or attempt to perform or induce an abortion on a pregnant woman if the person has knowledge that the pregnant woman is seeking the abortion, in whole or in part, because of any of the following:
>
> (1) A test result indicating Down syndrome in an unborn child;
>
> (2) A prenatal diagnosis of Down syndrome in an unborn child;
>
> (3) Any other reason to believe that an unborn child has Down syndrome.

O.R.C. § 2919.10(B). We held that there was not an "undue burden in a large fraction of cases in which it [was] relevant" and found the law to be substantively constitutional. *Id.* at 529.

Although section 217 is similar in effect to the Ohio law, an analysis of the law in this case diverges from that of *Preterm-Cleveland* for several reasons. First, the district court here determined that section 217 of the Tennessee law was unconstitutional because it was void for vagueness. *Preterm Cleveland* did not address such an argument. Second, section 217 also includes a ban for reasons pertaining to race and sex. The Ohio law did not include such provisions. Last, the language of the Ohio law and the facts of the record differ from this case, so that even if *Preterm-Cleveland* did address the void-for-vagueness argument (which it did not), our analysis would vary here.

We address *de novo* the district court's decision that a void-for-vagueness challenge to section 217 likely would succeed on the merits.

**Section 217 Void-for-Vagueness Challenge**

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Voinovich*, 130 F.3d at 197 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)). A "relatively strict" test is required when

"criminal penalties are at stake," and the most "stringent vagueness test" applies when a law "threatens to inhibit the exercise of constitutionally protected rights." *Id*; *Hoffman Estates*, 455 U.S. at 499 (holding that the possible inhibition of a constitutional right is "perhaps the most important factor").

The void-for-vagueness doctrine rests on "several important values." *Grayned*, 408 U.S. at 108. First, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id*. Second, "laws must provide explicit standards for those who apply them" to avoid arbitrary and discriminatory enforcement. *Id*. A law cannot stand if it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id*. at 108-09. Such laws "may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)). Third, vague laws are unconstitutional if they lead people to "steer far wider of the unlawful zone" than they would have if the criminalized conduct had been more clearly delineated. *Grayned,* 408 U.S. at 109 (internal quotation and citation omitted).

Relying on the extensive record, the district court made the factual determination that section 217 left many questions unanswered, "mak[ing] it impossible for a person of ordinary intelligence to know what conduct constitutes a crime." *Memphis Ctr.*, slip op. at 34-35. For example, physicians testified for the plaintiffs that they are unclear whether "knowing" that an abortion is sought "because of" a banned reason means that the reason must "be the only reason, the main reason, one of many reasons, or simply a factor that the individual considered." It is also unclear to those physicians whether performing an abortion when the patient's file notes a Down syndrome diagnosis or after a patient makes an inquiry regarding the sex of the fetus will be deemed an abortion "because of" one of those reasons and would thus incur criminal liability. The district court weighed these concerns against contrary evidence and determined the concerns were valid and credible. This determination is not "clearly erroneous," so we must accept it as true. *See June Med. Servs.*, 140 S. Ct. at 2132.

No. 20-5969     *Memphis Center for Reproductive Health, et al. v. Slatery, et al.*     Page 25

The State claims that the legislature *has* provided a definition of "knowing" and that it is "well-settled" that the term  "because of" implies but-for causation.  Gov't Br. at 25; *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) ("[A] but-for test directs us to change one thing at a time and see if the outcome changes.").  In support of its position, the State cites Tennessee Code Annotated § 39-11-106(a)(22):

> "Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist.  A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The State argues that use of the word "know" in the statute constitutes a scienter requirement that "alleviates vagueness concerns, narrows the scope of [a statute's] prohibition, and limits prosecutorial discretion."  Gov't Br. at 26 (quoting *McFadden v. United States*, 576 U.S. 186, 197 (2015)).  It is true that "a scienter requirement may mitigate a law's vagueness," *Hoffman Estates*, 455 U.S. at 499, but—as the district court explained—the distinct wording of this law requires that a doctor "know the motivations underlying the action of *another* person to avoid prosecution," while simultaneously evaluating whether the decision is "because of" that subjective knowledge.  *Memphis Ctr.*, slip op. at 35.

Perhaps the plaintiffs' strongest argument that the statute is unconstitutionally vague is that it encourages arbitrary enforcement.  The plaintiffs are concerned that given the "open hostility" toward abortion and abortion providers in Tennessee, a district attorney may prosecute them arbitrarily or that a jury may construe the imprecise language against the abortion providers.  Pl. Br. at 34-35.  The State acknowledges that "some cases might be difficult to determine what a person knew about the mental state of another," but resolves that the problem would be addressed "by the requirement of proof beyond a reasonable doubt."  Gov't Br. at 28 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).  However, this argument is a concession that the decision on what constitutes illegal behavior will be "impermissibly delegate[d]" to judges and juries who are then free "to pursue their personal predilections." *Grayned*, 408 U.S. at 109; *Kolender*, 461 U.S. at 358 (quoting *Smith*, 415 U.S. at 575). Of course, such a delegation violates the principle of due process.

Take, for example, a patient of advanced maternal age who visits CHOICES for counseling about her decision to terminate her pregnancy. In sorting through her options, she says that she has older children, does not feel like it is the right time in her life to have another, and has concerns about the financial impact another child will have on her family because she recently has been laid off from her job. Additionally, she says, a doctor advised her that because of her age, there is a heightened chance of a Down syndrome diagnosis. During her ultrasound, she inquires about the sex of the fetus and sounds disappointed when she is told it will be another boy—she always dreamed of having a girl. Ultimately, she decides that terminating the pregnancy is the best choice for her and her family. How does the physician determine—with that information at hand—whether she *knows* that the patient's decision to terminate was *because of* the sex of the baby, the risk of a Down syndrome diagnosis, or because of financial obligations and her advanced age? If the physician makes the judgment that the woman's decision to terminate was not "because of" one of the banned reasons, what assurance does the physician have that a local prosecutor will not see it differently? The State tells us that the plaintiffs should not be concerned about these questions because the jury will ultimately decide, first, whether the patient made the decision to terminate the pregnancy because of a banned reason and, second, whether the physician knew that was why the patient made the decision.

The dissent posits that understanding what section 217 prohibits is simple: "sex, race, or Down syndrome status need not be the only or most important reason for the abortion . . . [but] it must be a dispositive reason." But that contention reeks of speculation. Even the State has been unclear as to where the law falls in ambiguous situations. When asked at oral argument whether it would violate section 217 for a physician to provide an abortion to a person who gave two reasons for wanting an abortion—being poor and not wanting a child of that sex—counsel for the State admitted that the provider "really can't know the circumstances" and conceded "[not to] know if that would violate section 217," but added that it would be the "prosecution's burden to prove." This conundrum is what *Williams* was referring to when it described statutes that require a "subjective judgment" as "indetermina[te]." 553 U.S. at 306. It is this indeterminacy that distinguishes this law from others that require knowledge of another person's state of mind.

None of the State's—or the dissent's—examples of other criminal laws that require knowledge of another person's state of mind—rape, federal conspiracy, assisted suicide—necessitate the additional analysis of "but-for" causation of a third party in the way that section 217 requires.  *See* Gov't Br. at 28-30.  For example, rape laws require a person to know whether a third party consented or was capable of consenting to sex, but the laws do not require the person know *why* the other person is not consenting.  Nor do rape laws require a jury to determine the subjective state of mind of the victim.  The victim's state of mind is presumed by the fact that the case is being prosecuted.

The State also relies on cases addressing child-pornography laws that shift the burden of determining whether the law was violated to the government and the jury.  *United States v. Williams*, 533 U.S. 285, 305-306 (2008); *United States v. Paull*, 551 F.3d 516, 525 (6th Cir. 2009).  But those cases turn on "whether the incriminating fact [that the statute] establishes has been proved."  *Williams*, 553 U.S. at 306.  Rather, it is the "indeterminacy of precisely what the fact is" that requires "wholly subjective judgments" that render a statute vague.  *See id.*  Whether criminal defendants hold a belief that images they possess constitute child pornography, or have an intent to possess such images, differs greatly from section 217's requirement that physicians "parse through and make causal assessments regarding the but-for motivations" of someone else.  Pl. Br. at 32-33.

True, there are laws that require a jury to consider the subjective intent of a third party, but those laws involve criminal conduct by a third party that has already been determined.  For instance, prosecuting the aiding and abetting of a hate crime involves proof that the defendant aided and abetted the criminal conduct of a third party and that the third party's criminal conduct was *because of* the victim's protected class.  In such a case, the third party's alleged conduct was criminal, so regardless of the third party's subjective intent, the defendant is being charged with aiding and abetting battery or some other criminal act that occurred.  The "hate-crime" charge is essentially an enhancement to an indictment that would exist even without the enhancement.  In contrast, the third parties in this case are patients who have not been involved in any criminal

conduct—regardless of their reason for wanting an abortion.[15]   Moreover, by the time a defendant is on trial for aiding or abetting a hate crime, a jury likely has determined already that the third party's subjective intent qualified as a hate crime beyond a reasonable doubt through the evaluation of evidence, witnesses, and testimony.  By the time the jury evaluates whether a defendant was guilty of aiding and abetting a hate crime, the subjective intent of the third party is no longer at issue.  With section 217, on the other hand, patients whose subjective intent are at issue are not on trial, nor should they be subjected to an interrogation as to why they made such a difficult and personal decision.  In the prosecution of section 217, not only would the *mens rea* of two people be at issue, but also a not-well-defined causation between them.

These examples direct us to the final void-for-vagueness consideration: will this statute, which "abut[s] upon sensitive areas of [constitutional] freedoms . . . [,] require [physicians] to 'steer far wider of the unlawful zone'" of conduct?  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).  We believe the answer to that question is a resounding yes.

> The vice of the present procedure is that, where particular [conduct] falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate [conduct] will be penalized.  *The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens.*  This is especially to be feared when the complexity of the proofs and the generality of the standards applied provide but shifting sands on which the litigant must maintain his position.  How can a claimant whose declaration is rejected possibly sustain the burden of proving the negative of these complex factual elements?  In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly.  It can only result in a deterrence of [conduct] which the Constitution makes free.

*Speiser*, 357 U.S. at 526 (emphasis added).

---

[15]Similarly, this rationale distinguishes all of the other crimes listed by the dissent.  Sexual misconduct is illegal, and termination for such a reason is typically documented.  Escape from prison is illegal.  Sharing insider information that affects investments is illegal. Further, whether or not someone is an "insider" or a prison escapee is a fact-based inquiry that can be proven or disproven.  It does not require a subjective-intent analysis.

In their declarations to the court, two of the plaintiffs' declarants, Looney and Terrell, said that because of the risk of prison time and the possible imposition of up to $10,000 in fines, whenever race, sex, or the potential for fetal conditions are even mentioned by the patient or are implicated by a detail in a patient's chart, PPTNM and CHOICES would be forced to deny performing the procedure. Certainly, these are valid concerns because the State has conceded that even such circumstantial evidence may be used to prove "knowledge," resulting in criminal liability. Indeed, at oral argument, counsel for the State was unable to tell us whether similar hypothetical conduct would be considered illegal.

This point further distinguishes section 217 from the types of laws that the State and the dissent rely on. Whether they like it or not, access to safe and legal abortion is a Constitutional right. Committing, aiding, or abetting a hate crime is not. Insider trading is not. Neither is rape or the possession of child pornography. The reason these other laws exist is to deter criminal conduct and anything close to it. Conversely, precedent tells us that we cannot uphold laws that are so vague that they require persons to steer so clear of conduct that it infringes upon Constitutional rights. And because Constitutional rights are at stake, section 217 is subject to a much more "stringent" test than these other examples. *Voinovich*, 130 F.3d at 197; *Hoffman Estates*, 455 U.S. at 499.

Moreover, section 217 does not provide for any type of "good faith exception" that might assuage the Plaintiffs' fears. The dissent argues that the "shield[]" of good faith is an answer to the danger that the law's ambiguity poses to medical professionals. But section 217 does not provide for such an exception. Even if it did, good faith would not be so much an exception as it would be an affirmative defense, meaning that the doctor would have to be indicted and plead this defense to determine if her actions were legal. Precedent is very clear that the resolution of an ambiguous law cannot fall to juries. *Grayned*, 408 U.S. at 109; *Kolender*, 461 U.S. at 358. And because criminal penalties are at stake even when a decision is made in good faith, "[t]he degree of vagueness that the Constitution tolerates" is very low. *Hoffman Estates*, 455 U.S. at 498.

Furthermore, we have found that even laws with a good-faith exemption can be unconstitutionally vague when they contain both subjective and objective elements that require a

No. 20-5969    *Memphis Center for Reproductive Health, et al. v. Slatery, et al.*    Page 30

physician to determine another person's state of mind.  *Voinovich*, 130 F.3d at 204.  As we explained:

> [A] physician may act in good faith and yet still be held criminally and civilly liable if, after the fact, other physicians determine that the physician's medical judgment was not reasonable.  In other words, a physician need not act wilfully or recklessly in determining whether a medical emergency or medical necessity exists in order to be held criminally or civilly liable; rather, under the Act, physicians face liability even if they act in good faith according to their own best medical judgment.

*Id.*  Section 217's scienter requirement does not resolve this issue because "even if the physician believed he or she was acting reasonably" in determining that race or gender was not the determinative reason for wanting an abortion, "as long as others later decide that the physician's actions were nonetheless unreasonable," criminal penalties will apply.  *Id.* at 205.  Thus, the dissent's argument that "negligence does not suffice" and that physicians will not be held liable for "what they reasonably should have, but in fact did not, infer" will not hold up in practice.

The language of section 217 does not give persons of ordinary intelligence—physicians, in this case—a reasonable opportunity to know when they are permitted to perform an abortion. And considering the array of changing explanations the State has given for what conduct is prohibited, arbitrary prosecution could be invoked, and these "policy matters" could be "impermissibly delegate[d] . . . to policemen, judges, and juries for resolution on an ad hoc and subjective basis."  *Grayned*, 408 U.S. at 108-09.  As a result of this ambiguity and uncertainty, many abortion providers might well choose to steer clear of anything that could possibly be construed as prohibited conduct, effectuating the inaccessibility of a right deemed fundamental under the Constitution.  "'[T]he vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution.'"  *Baggett*, 377 U.S. at 372 (quoting *Cramp v. Bd. of Public Instr.*, 368 U.S. 278, 287 (1961)).  The district court correctly determined that the Plaintiffs were likely to succeed on their void-for-vagueness challenge.[16]

---

[16]The State argues that rather than striking down the law on vagueness grounds, this court should resort to "every reasonable construction" to save it.  Gov't Br. at 23-24 (citing *Gonzales*, 550 U.S. at 153).  But there is no way to construe this statutory language clearly enough to give notice as to when a discussion on identity issues as

**Reaching the Substantive-Due-Process Challenge to Section 217 in the First Instance**

In its determination that § 217 was unconstitutionally vague, the district court found it unnecessary to address the merits of the substantive-due-process challenge. *Memphis Ctr.*, slip op. at 32-33. The State now asks us to address—in the first instance—whether section 217 violates principles of substantive due process. Although we have discretion to decide matters in the first instance on appeal, *Singleton v. Wulff*, 428 U.S. 106, 121 (1976), we decline to do so at this time. The district court should resolve this issue in the first instance and, in doing so, should analyze the ban on abortions for Down syndrome separately from bans on abortions for reasons of race or sex. Although the decision in *Preterm-Cleveland* would be relevant to the Down syndrome clause of section 217, the issue of whether section 217's provisions banning abortions based on sex and race violate substantive-due-process principles is yet to be addressed in this circuit.[17]

In deciding this issue, the district court will have to evaluate the state interests put forward—a fact-intensive exercise that should scrutinize the underlying data purported to support the State's rationale—to confirm whether the interests are indeed legitimate. For example, the State points to no evidence—other than data showing that more woman of color have abortions than white women and various historical interpretations of eugenics—that demonstrates that its residents are pursuing abortion "because of" the race or sex of the fetus.[18]

---

complex as race and gender crosses over into criminal territory. Edited language cannot solve the challenge of requiring knowledge of another person's state of mind plus a "but-for" analysis. *See Williams*, 553 U.S. at 306.

[17]Although the *Preterm Cleveland* lead opinion "respectfully disagree[d]" with the Seventh Circuit decision finding that an Indiana statute banning abortions based on race or sex violated substantive-due-process principles, (1) the analysis did not garner a majority, (2) it did so on narrow grounds particular to it being a substantial burden, and (3) any extension of the analysis beyond the provision of the law on the fetal-diagnosis ban would be *dicta*. *See Preterm-Cleveland*, 994 F.3d at 529-30 (Batchelder, J., concurring) (citing *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 303 (7th Cir. 2018) *reh'g en banc granted, judgment vacated*, 727 F. App'x 208 (7th Cir. 2018), *vacated*, 917 F.3d 532 (7th Cir. 2019), *and opinion reinstated*, 917 F.3d 532 (7th Cir. 2018), *and cert. granted in part, judgment rev'd in part sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc*., 139 S. Ct. 1780 (2019)).

[18]"Implicit in these rationales is the baseless assumption that women of color are committing genocide against their own community. While Black women and women of color do have higher abortion rates, the host of structural racial burdens to which they are subjected create the conditions for this disparity." Br. of SisterReach as *Amicus Curiae* in support of Plaintiffs-Appellees at 25 (citing Susan A. Cohen, *Abortion and Women of Color*, GUTTMACHER INST., Aug. 2008, https://www.guttmacher.org/gpr/2008/08/abortion-and-women-color-biggerpicture

No. 20-5969     *Memphis Center for Reproductive Health, et al. v. Slatery, et al.*     Page 32

When the purported "problem" the State seeks to solve is virtually non-existent in practice, the rationale may be considered illegitimate or irrational. *See Whole Woman's Health*, 136 S. Ct. at 2311 (holding that because "there was no significant health-related problem that the new law helped cure," the law did not "advance Texas'[s] legitimate interest in protecting women's health").

The legislative findings also point to sex-selective abortions leading to gender imbalances and gender-based crime in other countries. Tenn. Code Ann. § 39-15-214(a)(58)–(61). But this common discourse repeatedly fails to consider the driving force of the desire to have sons: patriarchal systems, government interference in reproductive decisions, and laws that perpetuate gender inequality.[19]

The lack of data and failure to analyze the root of the cited problems, combined with Tennessee's failure to take other actions that would prevent discrimination in the state, undercut arguments that any "interests" in equality and preventing eugenics based on race and gender are legitimate concerns.  Considering that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives," *Casey*, 505 U.S. at 856, the State's purported interest in preventing discrimination appears to be directly frustrated by the enactment of this law.

---

(describing how women of color are more likely to have unintended pregnancies due to socioeconomic inequality, a lack of healthcare access, and unequal opportunities regarding contraception and sex education)).

[19] For example, in China, the desire was driven by the government's 35-year regulation limiting families to one child coupled with the desire to pass on the family name—a patriarchal (or patrilineal) system.  Lisa Cameron et al, *China's One-Child Policy: Effects on the Sex Ratio and Crime*, Inst. For Family Studies, Dec. 19, 2018, https://ifstudies.org/blog/chinas-one-child-policy-effects-on-the-sex-ratio-and-crime;  Das Gupta et al, *Why is Son Preference so Persistent in East and South Asia? A Cross-Country Study of China, India, and the Republic of Korea*, 40 J. OF DEV. STUDIES 153, 160  (June 4, 2010). In India, the desire is driven by the historical expense of having daughters:  because of gender inequality in the workforce, sons tend to be stronger breadwinners and can better support their parents; parents are forced to pay an expensive dowry when daughters marry, often bankrupting poor families; and "tradition requires a son to perform certain funeral rituals for his parents." Kalantry, *How To Fix India's Sex-Selection Problem*, N. Y. TIMES, Int'l ed., July 28, 2017, https://www.nytimes.com/2017/07/27/opinion/how-to-fix-indias-sex-selection-problem html (noting that India "has a long way to go before women achieve equality.  The United Nations Development Program ranked India 125 out of 159 countries in terms of gender equality."); Assoc. Press, *India Tries to Stop Sex-Selective Abortions,* N. Y. TIMES, Jul. 15, 2007,  *https://www.nytimes.com/2007/07/15/world/asia/15india html.*

**The Facial Challenge to the Medical-Emergency Provisions**

The plaintiffs argue, and the district court found, that both sections 216 and 217 are likely invalid because the medical-emergency provision, as required under *Casey*, is unconstitutionally vague. Although the facts and law support this determination, it is unnecessary to decide whether the medical-emergency affirmative defense is constitutional because the injunction on other grounds moots the issue.

**Balancing the Factors**

Given that the plaintiffs are likely to succeed on the merits of their constitutional challenges to sections 216 and 217, the only remaining question is whether the district court abused its discretion in finding that the other relevant factors weighed in favor of granting the preliminary injunction. *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). It did not.

As the district court noted, a violation of constitutional rights alone can demonstrate that the absence of an injunction will cause irreparable harm. *Memphis Ctr.*, slip op. at 40 ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages") (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). Additionally, the time-sensitive nature of the procedure would add to the adverse impact of the bans were they allowed to be enforced. *Id.* And because enforcement of the law would result in criminal sanctions and licensing implications for physicians, they would suffer irreparable injury as well. *Id.* at 40-41.

There is no evidence that anyone would suffer harm *because of* an injunction. *See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) ("[T]here is a likelihood that the Ordinance will be found unconstitutional; it is therefore questionable whether the City has any 'valid' interest in enforcing the Ordinance. Consequently, we find no substantial harm in preventing the City from enforcing it."). And last, the fourth factor is met because "the public is certainly interested in the prevention of enforcement of [regulations] which may be unconstitutional." *Id.*

## CONCLUSION

The district court properly issued a preliminary injunction prohibiting enforcement of sections 216 and 217 of H.B. 2263 because the provisions are constitutionally unsound. Although this circuit's recent—and alarming—decisions have broadened the extent to which the government may impede a person's constitutional right to choose whether to carry a pregnancy to term, the law remains clear that if a regulation is a substantial obstacle to a woman seeking an abortion, it is invalid. Nonetheless, the facts and law of this case vary from other recently decided cases on similar issues. The above analysis closely follows the precedents of our circuit and those of the Supreme Court, as well as the persuasive opinions of other circuits. Any decision to overturn the district court's finding of facts and well-reasoned decision would cast this court in the role of judicial activists.

We take note that state legislatures recently have passed more anti-abortion regulations than perhaps at any other time in this country's history.[20] However, this development is not a signal to the courts to change course. It is, in fact, just the opposite. The judiciary exists as a check on majoritarian rule. It has a duty to protect the Constitutional rights, including privacy and bodily autonomy, of those within its borders, even—or especially—if the relevant class of people "has [ ] been subjected to a 'tradition of disfavor' by our laws." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 453 (1985) (Stevens, J., concurring).

> [T]he framers presciently recognized that two of the three co-equal branches of government were representative in nature and necessarily would be guided by self-interest and the pull of popular opinion. To restrain those natural, human impulses, the framers crafted Article III to ensure that rights, liberties, and duties need not be held hostage by popular whims.

*DeBoer v. Snyder*, 772 F.3d 388, 436–37 (6th Cir. 2014) (Daughtrey, J., dissenting), *rev'd sub nom. Obergefell v. Hodges*, 576 U.S. 644 (2015). The State may not use the courts to "enforce

---

[20]The dissent relies on this as evidence of the public's anti-abortion consensus. But recent polling demonstrates that the percentage of Americans that believe abortion should be legal under any circumstance is at its highest rate in almost twenty years. According to Gallup, 57% of the population polled opposes bans on abortions done because the fetus has a genetic disorder, 58% oppose bans on abortion after a "heartbeat" is detected, and 56% oppose bans on abortion after the 18th week of a pregnancy. Only 27% of the population would like to see abortion laws made more strict. *Abortion*, Gallup, https://news.gallup.com/poll/1576/abortion.aspx (last accessed August 27, 2021).

[their moral principles] on the whole society through operation of the criminal law." *Lawrence*, 539 U.S. at 571.

For the reasons set out above, we AFFIRM the district court's judgment enjoining implementation of sections 216 and 217 of the Act.

---

## CONCURRING IN JUDGMENT IN PART AND DISSENTING IN PART

---

THAPAR, Circuit Judge, concurring in judgment in part and dissenting in part. There are rules for most cases, and then there are rules for abortion cases. This case proves the point.

Tennessee enacted two laws: One sets time limits for abortion; the other bans abortion based on discrimination. The first law sought to join nearly every country in the world by, among other things, protecting the unborn from unnecessary pain during abortion. Tennessee did this by limiting abortions after a baby's heartbeat can be heard. If a court finds the heartbeat restriction unconstitutional, then the limit kicks in only when a baby has reached 8 weeks gestation; if the 8-week restriction is deemed unconstitutional, then a 10-week restriction kicks in; and so on through 24 weeks.

None of these timing restrictions are permissible under the *Roe/Casey* framework. But *Roe* and *Casey* are wrong as a matter of constitutional text, structure, and history. As Justice Thomas recently reminded us, these cases "created the right to abortion out of whole cloth, without a shred of support from the Constitution's text." *June Medical Servs. v. Russo*, 140 S. Ct. 2103, 2142 (2020) (Thomas, J., dissenting).

By manufacturing a right to abortion, *Roe* and *Casey* have denied the American people a voice on an important political issue. "The permissibility of abortion, and the limitations upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 979 (1992) (Scalia, J., concurring in part and dissenting in part). The *Roe/Casey* regime has moved these policy debates from the country to the courtroom.

Unsurprisingly, wrenching responsibility from the hands of state legislatures and giving it to judges has resulted in acrimony and results-oriented decisions. *See Preterm-Cleveland v. McCloud*, 994 F.3d 512, 536 (6th Cir. 2021) (en banc) (Sutton, J., concurring). Judges have been enlisted to serve as legislators, producing a make-it-up-as-you-go abortion jurisprudence. All the while stripping states of their sovereign authority.

The *Roe/Casey* framework doesn't just conflict with the original understanding of the Constitution—it cannot be justified under any modern approach to constitutional interpretation. Even living constitutionalism, taken seriously, permits Tennessee's (and many other states') efforts to combat fetal pain. After all, the living constitution theory considers evolving standards of decency. *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) (plurality opinion). It looks to what is taking place in the states and the rest of the world as a barometer. *See Roper v. Simmons*, 543 U.S. 551, 575–78 (2005). And both the states and the rest of the world are in a much different place than our abortion jurisprudence.

Start with the states. In recent years, dozens of legislatures elected by tens of millions of voters have passed hundreds of laws to protect life. And public polling shows that most Americans support significant limitations on abortion. That shouldn't surprise us. Only seven other countries permit abortions after 20 weeks. That list includes China and North Korea—not exactly countries to emulate.

It doesn't have to be this way. The Founders understood that for our Republic to succeed, judges had to stay out of policy disputes. That's why on matters like abortion, where morality and theology meet with public policy and medicine, the Framers wisely took the decision out of judges' hands. Instead, they left the decision with state legislators, who could pass laws that reflect their constituents' oft-changing views on these difficult policy questions. The result? Tennessee can do one thing, Ohio another, and Kentucky and Michigan can learn from both.

But as a lower court judge, I am bound by the Supreme Court's decisions, whether right or wrong. And *Casey* mandates that we strike down any general bans on abortions before viability. Thus, I concur in the judgment as to section 216.

The second law prohibits doctors from knowingly participating in abortions that target unborn children because of their race, sex, or Down syndrome status. The law's operation is clear. Its causation requirement—"because of"—mirrors scores of federal and state statutes. Indeed, hundreds of criminal laws have exactly the same causation requirement. But the majority says that the same requirement, in this Act, is unconstitutionally vague. In reaching this

conclusion, the majority misapplies precedent and usurps the democratic processes of a sovereign state—all in service of an abortion right that exists nowhere in the Constitution. Conspiracy statutes. Anti-money laundering schemes. Anti-discrimination laws. Are they all now up for grabs?

On this point, the majority stands alone—against common sense, the English language, and basic legal principles. And its decision to strike down the anti-discrimination statute at the altar of abortion is wrong.

I.

A.

In July 2020, Tennessee's elected officials enacted H.B. 2263 (the "Act"). 2020 Tenn. Pub. Acts 764. Among other things, the Act aims to protect unborn children from the "unnecessary infliction of pain," to promote the "integrity of and public trust in the medical profession," to "protect[] the life, physical health, and mental health of women," and to "prevent[] discrimination and discriminatory practices" based on sex, race, and disability. Tenn. Code Ann. § 39-15-214(b). This case involves two provisions of the Act.

*Section 216.* The first provision governs when doctors can perform abortions. It prohibits abortions after a baby develops a heartbeat but provides doctors with an affirmative defense if there is a medical emergency. *Id.* § 39-15-216(c)(1), (e)(1). If a judge deems the heartbeat restriction unconstitutional, section 216 provides a series of back-ups. First, an 8-week restriction kicks in; if the 8-week restriction is deemed unconstitutional, then a 10-week restriction kicks in; and so on through 24 weeks.[1] *Id.* § 39-15-216(c)(3)–(12), (d)(1), (h). Once an unborn child reaches viability, a separate provision of Tennessee law (not challenged here) bans abortions absent a medical emergency. *Id.* § 39-15-211(b).

Section 216 is accompanied by numerous legislative findings. The General Assembly determined that a baby's heart may begin beating as early as 5 weeks and that the heartbeat can

---

[1]The number of weeks refers to "gestational age," which means "the age of an unborn child as calculated from the first day of the last menstrual period of a pregnant woman." Tenn. Code Ann. §§ 39-15-211(a)(3), 39-15-216(a)(2).

be detected as early as 6 to 8 weeks.  *Id.* § 39-15-214(a)(8)–(9).  For that reason, there is a rebuttable presumption that an unborn child has a heartbeat at 6 weeks.  *Id.* § 39-15-216(c)(2). And the General Assembly noted that while the medical community hasn't reached a consensus on when an unborn child is fully capable of feeling pain, there is evidence that physical developments supporting the capacity to feel pain occur early in pregnancy.  *Id.* § 39-15-214(a)(17)–(24), (26), (29).

Moreover, the General Assembly found that the United States is an outlier in the global community.  Few other countries allow abortions after 12 weeks, and even fewer after 20.  *Id.* § 39-15-214(a)(50)–(52).  Indeed, most countries reject medical practices that cause an unborn child pain.  *Id.* § 39-15-214(a)(67).  The Assembly noted that those practices "create a disdain for life" and significantly harm the medical profession's "integrity and public respect."  *Id.* § 39-15-214(a)(69).

*Section 217.*  The second provision prohibits doctors from performing an abortion when the doctor "knows that the woman is seeking the abortion because of" any one of three immutable characteristics:  (1) "the sex of the unborn child"; (2) "the race of the unborn child"; or (3) "a prenatal diagnosis, test, or screening indicating Down syndrome or the potential for Down syndrome in the unborn child."  *Id.* § 39-15-217(b)–(d).  Like section 216, section 217 provides doctors a medical-emergency affirmative defense.  *Id.* § 39-15-217(e)(1).

Legislative factfinding accompanies this section as well.  The General Assembly found that abortion is a historical outgrowth of biased and discriminatory policies aimed at reducing allegedly inferior populations.  The legislature noted that the "historical practice of abortion was rooted not in equality but in discrimination based on age, sex, and disability."  *Id.* § 39-15-214(a)(54).  For instance, Planned Parenthood founder Margaret Sanger argued that "birth control would open the way to the eugenicist" by reducing the "ever increasing, unceasingly spawning class of human beings who never should have been born at all."  *Id.* § 39-15-214(a)(56).  Another important figure in Planned Parenthood's history, former president Alan Guttmacher, "argued in the 1950's that abortion should be used to prevent the birth of disabled children."  *Id.* § 39-15-214(a)(57).  The legislature called for "[t]hese historic policies [to] be rejected and left on the ash heap of history."  *Id.* § 39-15-214(a)(53).

Further findings highlighted how abortion is deployed as a tool of discrimination around the world. The General Assembly found that sixty-seven percent of unborn children diagnosed with Down syndrome in the United States are aborted. *Id.* § 39-15-214(a)(60). And the legislature observed that the rates were even higher elsewhere in the world. *Id.* Likewise, widespread selective abortion of girls has produced major sex-ratio imbalances in certain countries and has encouraged the rise of human trafficking. *Id.* § 39-15-214(a)(58)–(61). The General Assembly also found that physicians' involvement in medical practices that promote discrimination significantly harms the profession's "integrity and public respect" and offends "the United States and Tennessee constitutions' affirmation of equal protection under the law." *Id.* § 39-15-214(a)(68)–(69).

*Severability Provisions.* Both sections 216 and 217 include robust and nearly identical severability provisions. *See id.* §§ 39-15-216(h), 39-15-217(i).

## B.

The same day that the General Assembly passed the Act, four Tennessee reproductive centers and two OB/GYNs ("the challengers") filed suit against several Tennessee officials ("Tennessee" or "the State"). The challengers attacked the Act on several fronts. First, they claimed that sections 216 and 217 violate the Supreme Court's substantive due process caselaw by banning pre-viability abortions. Second, they argued that sections 216 and 217 lack adequate medical-emergency exceptions. And third, they claimed that section 217 violates procedural due process because it fails to provide fair notice of the conduct it prohibits. These defects, they maintained, render the Act unconstitutional as applied to all pre-viability abortions and thus facially unconstitutional. *See Gonzales v. Carhart*, 550 U.S. 124, 156 (2007) (treating a challenge to a statute as applied to all pre-viability abortions as a facial challenge).

Only hours after Governor Lee signed the Act into law, the district court granted a temporary restraining order to suspend the Act's enforcement. Less than two weeks later, it followed up with a preliminary injunction to the same effect. The court held that section 216 impermissibly prohibits pre-viability abortions, that section 217 is void for vagueness, and that both lack a valid medical-emergency exception. The court didn't consider the challengers'

argument that section 217 violates substantive due process precedents.  The State appealed, and this court issued a stay pending appeal of the preliminary injunction as it affects section 217.

## II.

Section 216's ban on abortions after a heartbeat is detected cannot stand under the Supreme Court's abortion precedents.  But those precedents are wrong.  The *Roe/Casey* framework cannot be justified under the original meaning of the Constitution.  Nor can it be justified under a living constitutional approach.  And on top of that, the framework has proven unworkable in practice.  Nonetheless, my role as a lower court judge requires that I concur in the judgment.

## A.

### 1.

When reading the Constitution, we must remember that a law's meaning is fixed when it is enacted and does not change unless the law itself has been changed.  *See South Carolina v. United States*, 199 U.S. 437, 448 (1905) ("The Constitution is a written instrument.  As such its meaning does not alter.  That which it meant when adopted, it means now.").  *See generally* Keith E. Whittington, *Constitutional Interpretation* (1999).  And we determine this meaning by looking to the Constitution's "text, structure, and original understanding."  *NLRB v. Noel Canning*, 573 U.S. 513, 573 (2014) (Scalia, J., concurring).  In other words, we begin by asking what a reasonable reader at the time of ratification (the intended audience) would understand the Constitution's text to mean in light of the Nation's history and legal backdrop.  *See, e.g.*, *United States v. Sprague*, 282 U.S. 716, 729–34 (1931).  After all, that is the document the states signed on to and thus made legally binding.

It is the judge's job to enforce the written Constitution without fear or favor.  This duty constrains the judge from exercising power he or she does not have.  On this point, both Federalists and Anti-Federalists agreed.  As James Madison observed, "I entirely concur in the propriety of resorting to the sense in which the Constitution was accepted and ratified by the nation. . . .  And if that be not the guide in expounding it, there can be no security for a consistent

and stable, more than for a faithful exercise of its powers."  Letter from James Madison to Henry Lee (June 25, 1824), *in* 9 *The Writings of James Madison* 191 (G. Hunt ed., 1910).  Likewise, Brutus, a leading Anti-Federalist, urged that "courts are to give such meaning to the constitution as comports best with the common, and generally received acceptation of the words in which it is expressed, regarding their ordinary and popular use."  Brutus, *Essay XI* (Jan. 31, 1788), *in The Anti-Federalist* 162, 164 (Herbert J. Storing ed., 2d ed. 1985).  Both Madison and Brutus understood that a federal judiciary guarded by life tenure and salary protections could abuse its authority unless judges' discretion was hemmed in by the text.

2.

I now turn to the putative right to abortion and start with the text.  No one, including the *Roe* majority, contends that such a right exists in the text of the Articles of the Constitution.  Instead, jurists and commentators point to the Bill of Rights or the Fourteenth Amendment.  But you won't find the word "abortion" (or any equivalent) there either.  Indeed, many thoughtful legal scholars, including those who support abortion as a policy matter, have expressed skepticism of or outright hostility to the idea that the Constitution explicitly provides a right to abortion.[2]  The text does not bear it out.

So for a right to exist, the Supreme Court has told us the asserted right must be one that is "deeply rooted" in this Nation's "history, legal traditions, and practices."  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997).  The Court has offered two related requirements for determining whether the asserted right can claim such an auspicious historical pedigree.  Both require "look[ing] primarily to eminent common-law authorities (Blackstone, Coke, Hale, and the like), as well as to early English and American judicial decisions."  *Kahler v. Kansas*, 140 S. Ct. 1021, 1027 (2020).  First, the right must be "so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Glucksberg*, 521 U.S. at 721 (citations omitted and

---

[2] *See* Linda J. Greenhouse, *Constitutional Question: Is There a Right to Abortion?*, N.Y. Times Mag., Jan. 25, 1970, at 30 (describing the claim to a constitutional right to abortion "at first hearing . . . [as] fantastic, illusory. The Constitution is searched in vain for any mention of it"); John Hart Ely, *The Wages of Crying Wolf: A Comment on* Roe v. Wade, 82 Yale L.J. 920, 947 (1973) ("[*Roe v. Wade*] is *not* constitutional law and gives almost no sense of an obligation to try to be."); *see also* Archibald Cox, *The Role of the Supreme Court in American Government* 113–14 (1976) (stating that *Roe* "read[s] like a set of hospital rules and regulations" that "[n]either historian, layman, nor lawyer will be persuaded . . . are part of . . . the Constitution").

cleaned up). The right must be "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist" without its recognition. *Id.* (citations omitted and cleaned up). Second, the court must make a "careful description" of "the asserted fundamental liberty interest." *Id.* This is a tough test to pass. And rightly so. After all, when the judiciary recognizes a new right, we take the decision away from the American people.

The *Roe* majority claimed that a right to abortion easily clears that high hurdle. But in doing so, it rewrote history.[3]

The majority found that a right to abortion extended from the earlier common law through most of the nineteenth century. *Roe v. Wade*, 410 U.S. 113, 117 (1973) ("[T]his opinion place[s] some emphasis upon[] medical and medical-legal history and what that history reveals about man's attitudes toward the abortion procedure over the centuries."). To support that conclusion, the majority made three main points.[4] First, it asserted that "[i]t is undisputed that at common law, abortion performed *before* 'quickening'—the first recognizable movement of the fetus *in utero*, appearing usually from the 16th to the 18th week of pregnancy—was not an indictable offense." *Id.* at 132 (emphasis added) (footnotes omitted). It also doubted whether "abortion was ever firmly established as a common-law crime even with respect to the destruction of a quick fetus." *Id.* at 136. Second, the majority said that most states only began passing laws prohibiting abortion after the Civil War. *Id.* at 138–39. And third, the majority believed that by "the late 19th and early 20th centuries" state courts "focus[ed] on the State's

---

[3]I am not the first to point out the flaws in *Roe*'s historical analysis. In fact, generations of scholars have done the same. *See generally, e.g.*, Joseph W. Dellapenna, *Dispelling the Myths of Abortion History* (2006); John Keown, *Abortion, Doctors and the Law: Some Aspects of the Legal Regulation of Abortion in England from 1803 to 1982* (1988); Robert M. Byrn, *An American Tragedy: The Supreme Court on Abortion*, 41 Fordham L. Rev. 807 (1973); Robert A. Destro, Comment, *Abortion and the Constitution: The Need for a Life-Protective Amendment*, 63 Calif. L. Rev. 1250 (1975); John Finnis, *"Shameless Acts" in Colorado: Abuse of Scholarship in Constitutional Cases*, 7 Acad. Questions 10 (1994); Dennis J. Horan & Thomas J. Balch, Roe v. Wade*: No Justification in History, Law, or Logic*, in *Abortion and the Constitution: Reversing* Roe v. Wade *Through the Courts* 57 (Dennis J. Horan et al. eds., 1987); James S. Witherspoon, *Reexamining* Roe*: Nineteenth-Century Abortion Statutes and the Fourteenth Amendment*, 17 St. Mary's L.J. 29 (1985). This opinion draws on their meticulous work.

[4]I am aware that the *Roe* majority offered a fleet of additional historical arguments ranging from the views of the Persians and ancient Greeks on abortion to the Hippocratic Oath. But at some point, I must follow the mercy rule for the sake of both *Roe* and the reader. Gluttons for punishment can look elsewhere for a more thorough demolition of *Roe*'s historical foundations. *See generally* Dellapenna, *Dispelling Myths*; Horan & Balch, *No Justification in History*, in *Abortion and the Constitution*.

interest in protecting the woman's health rather than in preserving the embryo and fetus." *Id.* at 151.

But the *Roe* majority built its historical home on sand not rock. To begin, it relied heavily on two articles that Cyril Means (legal counsel to one of NARAL's predecessor organizations) penned in 1968 and 1971. Indeed, the *Roe* majority cited Means's work half a dozen times while giving no other historical secondary source a second look.

The majority's reliance on Means's work is surprising.[5] The historical errors in his scholarship stood out even to the attorneys who presented the scholarship to the *Roe* Court in the first place. *See* David J. Garrow, *Liberty and Sexuality: The Right to Privacy and the Making of* Roe v. Wade 500–01 & nn.40–42 (1994). An internal memorandum from Jane Roe's legal team warned that Means's "conclusions sometime[s] strain credibility." *Id.* at 501 n.41. It even acknowledged that Means had twisted the history "as necessary." *Id.* But the memorandum ultimately reasoned that Means had written "a piece so long" that it "preserve[d] the guise of impartial scholarship while advancing the proper ideological goals." *Id.*

Reliance on suspect sources like Means is just one of many reasons why historians and jurists have roundly criticized *Roe*'s historical foundations since the day it came down. *See, e.g.*, John R. Connery, *The Ancients and the Medievals on Abortion: The Consensus the Court Ignored*, *in Abortion and the Constitution*, at 123 ("The Court's version of history is so defective that it serves no useful purpose and the accurate account, far from validating the position of the Court, offers a very convincing argument against it.").[6] Judge Richard Posner characterized

---

[5]Multiple scholars have noted both how integral Means's work was to *Roe*'s conclusion and the glaring errors in his scholarship. *See, e.g.*, Dellapenna, *Dispelling Myths*, at 144–46, 326–31; Horan & Balch, *No Justification in History*, *in Abortion and the Constitution*, at 65–66.

[6]*See also* Horan & Balch, *No Justification in History*, *in Abortion and the Constitution*, at 58 ("Virtually every aspect of the historical, sociological, medical, and legal arguments Justice Harry Blackmun used to support the *Roe* holdings has been subjected to intense scholarly criticism."); Dellapenna, *Dispelling Myths*, at 689 (dismissing the majority's historical analysis as "imbalance[d]" and "wrong on all points"); Finnis, 7 Acad. Questions at 11 ("I shall just say that the most important of the assertions . . . about the historical facts are demonstrably false, and have been shown to be false in scholarly publications to which no reply has been forthcoming."); Byrn, 41 Fordham L. Rev. at 814 ("Unfortunately, the Court's understanding of the Anglo-American history of the law of abortion is both distorted and incomplete."); Destro, 63 Calif. L. Rev. at 1273 ("The Court's uncritical acceptance of an advocate's interpretation of the common law only served to confuse the issues and to rest an important constitutional holding on an erroneous historical foundation.").

*Roe*'s historical recitation as "sophomoric."  Richard A. Posner, *Judges' Writing Styles (and Do They Matter?)*, 62 U. Chi. L. Rev. 1421, 1434–35 (1995).

Indeed, none of *Roe*'s three main points have survived the onslaught of scrutiny. Academics have spilled plenty of ink discrediting *Roe*'s law-office history, so I will give only a brief overview.

Let's start with the common law.  It is never good to find yourself disagreeing on the common law with Chief Justice Sir Edward Coke, Sir William Blackstone, Henry de Bracton, Sir Matthew Hale, and William Hawkins.  And these preeminent jurists have all illuminated the common law's unwavering view of abortion as the unlawful killing of a human being.[7]  Yet the *Roe* majority brushed each of them aside.

For example, in his famous *Institutes*, Coke identified abortion as a "great misprision"—a serious misdemeanor.  3 Coke, *Institutes*, at 50.[8]  If a provider attempted an abortion but the child died after being born alive, the Crown could prosecute for murder.  *Id.*  How did the *Roe* majority confront this?  First, it relied on Means to claim that Coke "may have intentionally misstated the law."  410 U.S. at 135 n.26.  Then the majority attacked the generations of lawyers and jurists who have followed Coke—saying they did so "uncritical[ly]."  *Id.* at 135–36.

The *Roe* majority's argument hinged on two fourteenth-century cases that Means evocatively dubbed *The Twinslayer's Case* and *The Abortionist's Case*.[9]  Cyril C. Means, Jr., *The Phoenix of Abortional Freedom: Is a Penumbral or Ninth-Amendment Right About to Arise*

---

[7]*See, e.g.*, 3 Edward Coke, *Institutes of the Laws of England* 50 (1644); 1 William Blackstone, *Commentaries* *125–26; 2 Henry de Bracton, *On The Laws and Customs of England* 341 (George E. Woodbine ed., Samuel E. Thorne trans., 1977) (c. 1256); 1 Matthew Hale, *The History of the Pleas of the Crown* 433 (1736); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 188 (7th ed. 1795).

[8]Coke identified two types of misprisions at common law:  crimes of omission and crimes of commission. The first involved concealment of a felony or treason; the second encompassed "many great offences which are neither treason nor felony."  3 Coke, *Institutes*, at 36, 139.  Abortion of a quick fetus was considered the latter.  *Id.* at 50.

[9]While the fourteenth-century common-law cases are surely relevant to our understanding of the history, what matters most is what the common law meant to the ordinary reader at either the time of the Founding or during the Reconstruction Era.  And yet even on its own terms, Means's argument does not have merit.  As one scholar has shown, the *Twinslayer's Case* can actually be read as evidence that "abortion was indeed a common law crime as early as 1327."  Destro, 63 Calif. L. Rev. at 1269.  And in any case, by the time of the Founding, the common law had settled on Coke's view that abortion was a criminal act.  *See, e.g.*, 1 Blackstone, *Commentaries* *125–26.

*from the Nineteenth-Century Legislative Ashes of a Fourteenth-Century Common-Law Liberty?*, 17 N.Y.L.F. 335, 337–39 (1971)..  According to Means, the failure of the court in *Twinslayer's* to convict those accused of performing abortions confirms that abortion "was not an offense of any kind, no matter at what stage of gestation it was performed." *Id.* at 342.  The *Roe* majority came to largely the same conclusion.

But Means was wrong.  As multiple scholars have established (without answer), early common-law cases showed that "abortion was a crime," even though "difficulties in pleading and proof barred prosecution and conviction" in many instances.  Byrn, 41 Fordham L. Rev. at 819; *see also* Destro, 63 Calif. L. Rev. at 1267–78; Justin B. Dyer, *Slavery, Abortion, and the Politics of Constitutional Meaning* 105–32 (2013).  These cases were difficult to prove because to successfully bring a homicide case, the state had to show (1) that the child was alive before the abortion and (2) that the abortion caused the child's death.  Byrn, 41 Fordham L. Rev. at 817.  As one might expect, the rudimentary nature of scientific knowledge and abortion technology made it difficult for prosecutors to prove either, let alone both.  Joshua J. Craddock, *Protecting Prenatal Persons: Does the Fourteenth Amendment Prohibit Abortion?*, 40 Harv. J.L. & Pub. Pol'y 539, 553 (2017).  But "nothing in these cases . . . suggest[s] that abortion was regarded as a 'freedom.'"  Byrn, 41 Fordham L. Rev. at 819.  After all, evidentiary challenges are a world away from a substantive claim that the common law tolerated abortion, much less protected it as a right.

The 1601 *Sims' Case* illustrates the point.  The Queen's Bench held that attempted abortion was indictable as murder if a born-alive child later died, but only if there were marks of an abortion.  It reasoned that the marks provided the necessary link between the abortion and the child's death:  The court could consider "whether [those] wounds were the cause of the death or not."  *Sims' Case* (1601) 75 Eng. Rep. 1075, 1075–76 (QB).  But again, this high evidentiary hurdle did not mean that the common law condoned abortion.  To the contrary, *Sims* shows that the common law protected human life as soon as it could be reliably detected, notwithstanding defendant-protective evidentiary rules.  For example, it was clear to Lord Coke, who was attorney general at the time, that even if the child was born dead and the person who performed

the abortion could not be indicted for murder, the abortion was still considered "a great misprision."  3 Coke, *Institutes*, at 50.

The cases that followed *Sims* prove the same.  Abortion was consistently tried under common law in both England and America.  *See, e.g.*, *R. v. Webb*, ASSI 35/44/7 m.18 (1602) (reproduced in part in Dellapenna, *Dispelling Myths*, at 193) (pardoned); *Commonwealth v. Bangs*, 9 Mass. (1 Tyng) 387, 387–88 (1812); *State v. Cooper*, 22 N.J.L. 52, 54–58 (N.J. 1849); *Mills v. Commonwealth*, 13 Pa. 631, 633–34 (1850); *Abrams v. Foshee*, 3 Iowa 274, 278–80 (1856); *see also* Dellapenna, *Dispelling Myths*, at 194 n.84 (collecting seventeenth-century cases); Finnis, 7 Acad. Questions at 11; *id.* at 15 (discussing a 1652 case finding Captain William Mitchell guilty of felony charges for having "Murtherously endeavored to destroy or Murder the Child by him begotten in the Womb of the Said Susan Warren" (quoting 10 *Md. Archives* 81 (Browne ed.))).

Blackstone, the preeminent jurist of the common law, serves a final blow.  While Blackstone was "clearly aware of the authorities cited by Professor Means in his attempt to undermine Coke's exposition of the law," he found them unpersuasive.  Keown, *Abortion, Doctors and the Law*, at 10.  Indeed, the first chapter of Blackstone's four-volume treatise discusses the rights of the child in the womb.  *See* 1 Blackstone, *Commentaries* *125–26.  Blackstone said that abortion was "a very heinous misdemeanor" as life is "a right inherent by nature in every individual; and it begins in contemplation of law as soon as an infant is able to stir in the mother's womb."  *Id.*[10]

Given these authorities, the *Roe* majority's first conclusion that abortion was not a criminal offense at common law cannot stand.

Its second conclusion fares no better.  The majority asserted that it "was not until after the War Between the States that [abortion] legislation began generally to replace the common law."  *Roe*, 410 U.S. at 139.  Not so.  According to one scholar, by 1849, eighteen of the thirty states in

---

[10]The quickening distinction was designed to "protect human life as soon as it could be discerned"; it does not reflect a judgment that the unborn child deserved less protection at an earlier stage.  Joshua J. Craddock, *Protecting Prenatal Persons: Does the Fourteenth Amendment Prohibit Abortion?*, 40 Harv. J.L. & Pub. Pol'y 539, 554 (2017); *see also* Keown, *Abortion, Doctors and the Law*, at 3; Byrn, 41 Fordham L. Rev. at 825.

the Union had passed statutes limiting abortion. Eugene Quay, *Justifiable Abortion–Medical and Legal Ethics*, 49 Geo. L.J. 395 app. 1 at 447–520 (1961) (collecting statutes). At the end of 1864, twenty-seven of the Nation's thirty-six states had such laws. *Id.* On the eve of the Fourteenth Amendment's ratification, this number had risen to thirty states. *Id.*; *see also Roe*, 410 U.S. at 174–75 & n.1 (Rehnquist, J., dissenting) (noting that the number was thirty-six when including the territories). The tide continued to shift in favor of greater abortion restrictions during the Reconstruction Era. Of the seven states that lacked abortion restrictions in 1868— Delaware, Georgia, Kentucky, North Carolina, Rhode Island, South Carolina, and Tennessee— all but one adopted abortion statutes by 1896. *See* Quay, 49 Geo. L.J. 395 app. 1 at 447–520. And the last of those states passed its statute by 1910. *See id.* at 475–76.

Undeterred, the *Roe* majority continued to its third and final conclusion: The "few state courts called upon to interpret their [abortion] laws in the late 19th and early 20th centuries [] focus[ed] on the State's interest in protecting the woman's health rather than in preserving the embryo and fetus." 410 U.S. at 151. That too is mistaken. Consider three readily available examples. The Supreme Court of New Jersey noted that its 1872 abortion law was enacted "to protect the life of the child also, and inflict the same punishment, in case of its death, as if the mother should die." *State v. Gedicke*, 43 N.J.L. 86, 90 (N.J. Sup. Ct. 1881). Similarly, in Alabama, one state appellate court reasoned that "from the first day of its uterine life[]" an unborn child "acquire[s] a legal and moral status that entitles it to the same protection as that guaranteed to human beings in extrauterine life." *Trent v. State*, 73 So. 834, 836 (Ala. Ct. App. 1916). Ohio's highest court also construed its abortion statute as intended to "protect women and unborn babes from dangerous criminal practice." *State v. Tippie*, 105 N.E. 75, 77 (Ohio 1913). And this is just the tip of the iceberg.[11]

---

[11]Many other cases described anti-abortion laws as designed, at least in part, to protect the unborn child. *See, e.g., State v. Bassett*, 194 P. 867, 868 (N.M. 1921); *State v. Powell*, 106 S.E. 133 (N.C. 1921); *State v. Ausplund*, 167 P. 1019, 1022–23 (Ore. 1909); *Weightnovel v. State*, 35 So. 857, 858–59 (Fla. 1903); *Worthington v. State*, 48 A. 355, 357 (Md. 1901); *State v. Alcorn*, 64 P. 1014, 1019 (Idaho 1901); *State v. Crook*, 51 P. 1091, 1093 (Utah 1898); *Moore v. State*, 40 S.W. 287, 289–95 (Tex. Ct. Crim. App. 1897); *Hatchard v. State*, 48 N.W. 380, 381 (Wis. 1891); *People v. Sessions*, 26 N.W. 291, 293 (Mich. 1886); *Railing v. Commonwealth*, 1 A. 314, 315 (Pa. 1885); *State v. Watson*, 1 P. 770, 771–72 (Kan. 1883); *Earll v. People*, 99 Ill. 123, 132 (1881); *Dougherty v. People*, 1 Colo. 514, 522 (1872); *State v. Moore*, 25 Iowa 128, 131–32 (1868); *State v. Howard*, 32 Vt. 380, 399–401 (1859); *Smith v. State*, 33 Me. 48, 57–59 (1851).

The courts weren't alone. As noted, the latter half of the nineteenth century saw a wave of new abortion laws across the Nation. And during this period, twenty-one states and the District of Columbia provided for the same punishment for the death of either the mother or the unborn child. Witherspoon, 17 St. Mary's L.J. at 40–41. Meanwhile, only three states gave a heavier punishment for the death of the mother than for the death of the unborn child. *Id.* at 41. Supporters of anti-abortion statutes spoke openly about the importance of protecting the unborn child. As one scholar said, "[o]ne could pick almost any anti-abortion tract from the nineteenth century, open it at random, and find the argument." Dellapenna, *Dispelling Myths*, at 322.

What's more, doctors helped drive that nationwide wave of legislation to protect unborn children at every stage of gestation. Why? Because medical advances confirmed that an unborn child is a living and distinct human being from the moment of conception. The American Medical Association, for example, rejected the notion "that the fetus is not alive till after the period of quickening" and implored lawmakers to remedy any "defects of our laws, both common and statute, as regards the independent and actual existence of the child before birth as a living being." *Report of the Committee on Criminal Abortion*, *in* 12 *Transactions of the American Medical Association* 75–76 (1859). The states listened: By 1868, the overwhelming majority of states had "incriminated abortional acts prior to quickening." Byrn, 41 Fordham L Rev. at 836; *see also* Dellapenna, *Dispelling Myths*, at 315–17. The quickening rule had outlived its evidentiary purpose. It is little wonder that Chief Justice John Tenney of the Maine Supreme Court could say that "jurists in all countries where an enlightened jurisprudence exists in practice" had abandoned "the quickening distinction." I.T. Dana, *Report of the Committee on the Production of Abortion*, *in* 5 *Transactions of the Maine Medical Association* 38 (1869).

Perhaps sensing its weak historical footing, the *Roe* majority switched horses midstream. Rather than argue that the right to abortion was affirmatively protected in early America, it contended that abortion was simply not forbidden. From this the *Roe* majority inferred that "a woman enjoyed a substantially *broader right* to terminate a pregnancy than she does in most States today." 410 U.S. at 140 (emphasis added). That inference is wrong. A right to do something because the state *has not* yet regulated it is quite different from a right to do something because the state *cannot* regulate it. *Cf. PennEast Pipeline Co. v. New Jersey*, 141 S.

Ct. 2244, 2261 (2021) ("[T]he nonuse[] of a power does not disprove its existence." (citation omitted)).  And as discussed above, almost every state and territory had in fact passed laws limiting or prohibiting abortion by the end of the nineteenth century.  By contrast, the *Roe* majority did not provide a single example of a state that legally guaranteed an affirmative right to abortion at either the time of the Founding or during the Reconstruction Era.  That silence is not just deafening.  It should end the debate.

Under any test for evaluating the historical pedigree of an alleged right, the right to an abortion does not just miss the mark.  It flunks out.

3.

The Court quietly retired *Roe*'s historical arguments nineteen years later in *Casey*.  Though the controlling joint opinion in *Casey* stated that "[o]ur Constitution is a covenant running from the first generation of Americans to us," its historical horizons stretch only as far back as *Roe* itself.  *Casey*, 505 U.S. at 901.  The opinion offered no historical evidence that could ground a right to abortion.  Only Chief Justice Rehnquist's dissent engaged with the history when he repeated his admonitions from *Roe* that regulations limiting abortion are deeply rooted in our Nation's heritage.  And most tellingly, Justice Blackmun (*Roe*'s author) did not mention Cyril Means in his concurrence, much less *Roe*'s strained reading of the common law or nineteenth-century American caselaw.

In short, *Casey* shifted the goalposts.  While the *Roe* majority purported to ground a right to abortion in history, the *Casey* plurality instead justified the right under the theory that the Constitution is an aspirational document.  Although the Constitution's words stay the same, the plurality reasoned that each "generation must learn anew that the Constitution's written terms embody ideas and aspirations that must survive more ages than one."  *Id.*

Even accepting *Casey*'s logic, the right to abortion cannot stand as it currently exists.  If the *Casey* plurality truly believed that we have a living Constitution, then courts should—indeed, must—consider what has happened since *Casey* was decided nearly thirty years ago.  In the past, when the Court has "updated" our constitutional charter on living constitutional grounds, it has aimed to identify values that are purportedly embodied in the Constitution but not grounded in its

text.  *Casey*, for example, identified personal dignity and autonomy as values in the Constitution that grounded a right to abortion.  *See* 505 U.S. at 851.  The Court then defined the scope of the right, drawing a line at viability.  But how do living constitutionalists assess whether this line still comports with an evolving constitution?  They often consider (1) public opinion (usually demonstrated by what the states are doing), (2) the international community's general practices, and (3) new empirical evidence.  *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 179–81 (1976); *Roper*, 543 U.S. at 574–76; *Lawrence v. Texas*, 539 U.S. 558, 571–73 (2003); *Printz v. United States*, 521 U.S. 898, 976–77 (1997) (Breyer, J., dissenting); *Dist. Attorney's Office for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 104 (2009) (Souter, J., dissenting).  And examining these sources reveals that the test the Court manufactured in *Casey* can't be sustained.  Living constitutionalism created *Casey*, but now it should dismantle it.

*First*, as a matter of public opinion, abortion remains one of the most hotly contested issues in American life.  In recent years, many state legislatures, representing tens of millions of Americans, have adopted new protections for unborn children even in the face of *Casey*'s strictures.[12]  One study reported that states enacted 90 laws restricting abortion in the first six months of 2021 alone—more "than in any year since the *Roe v. Wade* decision was handed down in 1973."  Elizabeth Nash & Sophia Naide, *State Policy Trends at Midyear 2021: Already the Worst Legislative Year Ever for U.S. Abortion Rights*, Guttmacher Inst. (July 1, 2021).  This ongoing flurry of legislative action suggests that, if a moral consensus does emerge on abortion, there's every chance it could be one that protects the life of the unborn at most stages of gestation.  Indeed, public polling has consistently shown that two-thirds of Americans support limiting abortion after the first trimester.[13]  *See, e.g.*, Randy Beck, *Twenty-Week Abortion*

---

[12]Forty-three states currently have gestational limits on abortion, twenty-one states ban partial-birth abortions, thirteen states mandate counseling on fetal pain, and twenty-five states require waiting periods after counseling.  *An Overview of Abortion Laws*, Guttmacher Inst. (Sept. 1, 2021), http://www.guttmacher.org/state-policy/explore/overview-abortion-laws.  And that doesn't include states that have unsuccessfully tried to restrict abortion.  Courts have enjoined laws banning partial-birth abortion in eleven states and waiting-period laws in four.  *Id.*

[13]The majority points to polling that shows only 27% of the population supports making abortion laws stricter.  But the polling also shows even fewer support making abortion laws more lenient (17%) or are satisfied with the current state of abortion law (11%).  If anything, this back-and-forth over polling resembles a tennis match more than a sober exercise of judging.  It also reveals the problematic nature of relying on public consensus to guide

*Statutes: Four Arguments*, 43 Hastings Const. L.Q. 187, 199 (2016); *Americans' Opinions on Abortion*, Knights of Columbus/Marist Poll National Survey (Jan. 2021), http://www.kofc.org/en/resources/news-room/polls/kofc-national-survey-with-tables012021.pdf; *Abortion*, Gallup, https://news.gallup.com/poll/1576/abortion.aspx.

*Second*, "the United States is an outlier within the international community" when it comes to abortion. Tenn. Code Ann. § 39-15-214(a)(50)–(52). Of the sixty-seven countries that allow abortion "on request," at least forty-six restrict its availability after the first trimester (or earlier). *See The World's Abortion Laws*, Ctr. for Reprod. Rts. (Aug. 18, 2021), https://maps.reproductiverights.org/worldabortionlaws. Portugal, for example, bans abortion after ten weeks and, even before then, an abortion can be obtained only after a three-day waiting period. Germany similarly requires a three-day waiting period but prohibits abortion after fourteen weeks unless there is a medical necessity. Strafgesetzbuch [StGB] [Penal Code] Nov. 13, 1998, BGBl. I, §§ 218, 218a. And France likewise proscribes abortion after fourteen weeks unless two physicians certify that the abortion is performed because of severe infant abnormalities or will prevent grave harm to the woman's health. Code de la Santé Publique [Public Health Code] art. L2212-1, L2213-1 (Fr.).[14]

That's to say nothing of the 117 countries that either ban abortion outright or sharply limit its availability to narrow instances. *The World's Abortion Laws*, Ctr. for Reprod. Rts. (Aug. 18, 2021), https://maps.reproductiverights.org/worldabortionlaws. In Poland, for example, abortion is limited to cases of rape, incest, or when the woman's health is at risk. By contrast, only seven countries join us in permitting abortions after twenty weeks. *Id.* And this list includes China and North Korea. That alone should give us pause.

---

constitutional interpretation. How is a judge to determine when such a consensus exists? Because judges are unequipped to answer that question, I think the better approach is to look to the text and history of the Constitution.

[14]Gestational limits are typically calculated from the first day of the last menstrual period, which is considered to occur two weeks prior to conception. Germany and France, however, calculate gestational limits from the date of conception. *See The World's Abortion Laws*, Ctr. for Reprod. Rts. (Aug. 18, 2021), https://maps reproductiverights.org/worldabortionlaws. I control for this variance by extending the limits by two weeks.

In sum, international practice supports far greater constitutional protection for unborn children than our current jurisprudence permits.

*Third*, the steady march of science undermines the Court's decisions in *Roe* and *Casey*. As to the question "when life begins," the *Roe* majority maintained that "at [that] point in the development of man's knowledge," it was "not in a position to speculate." 410 U.S. at 159. Whether or not the scientific answer to that question was clear then, it is now. From fertilization, an embryo (and later, fetus) is alive and possesses its unique DNA. Enrica Bianchi, et al., *Juno Is the Egg Izumo Receptor and Is Essential for Mammalian Fertilization*, 508 Nature 483, 483 (2014) ("Fertilization occurs when sperm and egg recognize each other and fuse to form a new, genetically distinct organism."). Moreover, from conception on, the human embryo is "fully programmed and has the active disposition to use that information to develop himself or herself to the mature stage of a human being." Robert P. George & Christopher Tollefsen, *Embryo: A Defense of Human Life* 50 (2008). Indeed, the Supreme Court has recognized these advancements, noting that "by common understanding and scientific terminology, a fetus is a living organism while within the womb, whether or not it is viable outside the womb." *Gonzales*, 550 U.S. at 147; *see also Hope Clinic v. Ryan*, 195 F.3d 857, 887 (7th Cir. 1999) (Posner, C.J., dissenting) ("Obviously a one-day old embryo, like the cells that compose a living human body, is alive, not 'dead.'").

In addition, new medical innovations have deepened our understanding of fetal development. For example, ultrasound technology now allows parents to "watch the growth and development of the[ir] unborn child in a way previous generations could never have imagined." *Hamilton v. Scott*, 97 So.3d 728, 746 (Ala. 2012) (Parker, J., concurring). These images reveal how an unborn child visibly takes on "the human form" in all relevant aspects by 12 weeks' gestation. *Cf. Gonzales*, 550 U.S. at 160. In the three decades since *Casey*, "neonatal and medical science . . . now graphically portrays . . . how a baby develops sensitivity to external stimuli and to pain much earlier than was then believed." *McCorvey v. Hill*, 385 F.3d 846, 852 (5th Cir. 2004) (Jones, J., concurring). And it "takes no expert prognosticator" to recognize that these scientific advances will continue. *Id.* at 853.

Indeed, medical researchers are hard at work every day "push[ing] the frontiers of fetal 'viability' ever closer to the date of conception." *Id.* Just over a year ago, doctors in Minnesota set a new world record by successfully delivering a baby at just over twenty-one weeks—nearly five months before his due date. Alaa Elassar, *The World's Most Premature Baby Has Celebrated His First Birthday After Beating 0% Odds of Surviving*, CNN (June 19, 2021). Though he was given a "0% chance of survival," Richard Scott William Hutchinson celebrated his first birthday just a few months ago. *Id.* Stories such as Hutchinson's will continue to pile up in the coming years. And yet the *Roe/Casey* framework gives judges—not lawmakers—responsibility to assess these scientific developments. This mismatch of functions "leaves our nation in a position of willful blindness to evolving knowledge." *McCorvey*, 385 F.3d at 853 (Jones, J., concurring). Living constitutionalism purports to take changing empirical facts seriously. If that is true, then the *Roe/Casey* framework must be reexamined.

\*    \*    \*

I would not take the living constitutional route. Dismissing our constitutional text and history—as the *Casey* plurality did—is never wise. After all, we must remember that because "the private stock of reason . . . in each man is small, . . . individuals would do better to avail themselves of the general bank and capital of nations and of ages." 3 Edmund Burke, *Reflections on the Revolution in France*, *in The Harvard Classics* 143, 223 (Charles W. Eliot ed., 1980) (1790). And judicial humility is especially important when it comes to constitutional decisions.

The *Casey* plurality appeared to understand that *Roe* departed from the Constitution's original meaning. But it chose to rely on *stare decisis* to reaffirm *Roe* even while questioning its soundness. *See Casey*, 505 U.S. at 853, 857, 860–61. These reservations possibly explain *Casey*'s unusual embrace of a "new[] keep-what-you-want-and-throw-away-the-rest version" of *stare decisis*. *Id.* at 993 (Scalia, J., concurring in part and dissenting in part). While *Roe* recognized a constitutional right to abortion, it held that states could still restrict abortion during the second and third trimesters of pregnancy. The *Casey* plurality threw that bright-line (though historically unmoored) trimester test out the window. In its place, the plurality instituted a nebulous "undue burden" test: Until an unborn child reaches viability, states cannot impose restrictions that unduly burden a right to abortion. *Id.* at 878–79.

Just as it had with *Roe*'s trimesters, the Court in *Casey* "plucked" the undue burden test "from nowhere." *Id.* at 965 (Rehnquist, C.J., concurring in part and dissenting in part). And it shows. Justice Scalia confessed at the time that he did not "understand . . . what the 'undue burden' test means." *Id.* at 993 (Scalia, J., concurring in part and dissenting in part). As lower court opinions repeatedly demonstrate, this concept continues to evade comprehension.

B.

Predictability and consistency are rare virtues in abortion jurisprudence. That's because the undue burden test we are tasked with applying has proved inherently resistant to neutral and principled application. By asking lower courts to figure out when a burden becomes undue, *Casey* poses a set of subjective questions that do not lend themselves to objective answers. Yet when deciding "the most heated partisan issues," "judicial responsibility to avoid standardless decisionmaking is at its apex." *June Medical Servs.*, 140 S. Ct. at 2179 (Gorsuch, J., dissenting) (citation omitted).

While abortion is not the only contentious issue that divides courts, it is the most prominent issue where courts fail to "evenhandedly apply[] uncontroversial legal doctrines." *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 814 (1986) (O'Connor, J., dissenting). Though Justice O'Connor penned those words thirty-five years ago, they still ring true today.

What legal rules and doctrines have suffered at the hand of abortion jurisprudence? Statutory interpretation, the rules of civil procedure, the standards for appellate review of legislative factfinding, and the First Amendment to name a few. *See Gonzales*, 550 U.S. at 153–54 (statutory interpretation); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2330–31 (2016) (Alito, J., dissenting) (res judicata and severability); *June Medical Servs.*, 140 S. Ct. at 2171–72 (Gorsuch, J., dissenting) (legislative factfinding); *Hill v. Colorado*, 530 U.S. 703, 742–65 (2000) (Scalia, J., dissenting) (First Amendment). And the examples only multiply in the lower courts, where abortion often goes hand-in-hand with acrimony. Simply put, "no legal rule or doctrine [bearing any link to abortion] is safe from ad hoc nullification." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 785 (1994) (Scalia, J., concurring) (citations omitted).

The disputes don't just lie at the procedural periphery. Rather, they emanate from abortion law's doctrinal core. When *Casey* introduced the undue burden test, the plurality acknowledged the confusion it set in motion. "Even when jurists reason from shared premises," the plurality predicted that "disagreement [was] inevitable." *Casey*, 505 U.S. at 878. Yet the plurality downplayed these concerns by explaining that disagreement "is to be expected" whenever judges fashion "any legal standard which must accommodate life's complexity." *Id.*

But the problem is that the *Roe/Casey* framework is so malleable that *no* two judges can even "reason from shared premises." *Id.* Like a maze, the doctrine forces an arbitrary and policy-laden decision at every turn. Here is a sampling of our abortion jurisprudence.

*Undue Burden*. In *Casey*, the plurality recognized that the "State's important and legitimate interest in potential life" had been given too little weight. *Id.* at 871 (cleaned up). The plurality believed the undue burden standard would provide a better way to reconcile the State's interest in protecting life with "the woman's constitutionally protected liberty." *Id.* at 876.

What happened after *Casey* proves otherwise. As the plurality recognized, a state's interest in protecting unborn children is inherently in tension with a woman's interest in obtaining an abortion. In theory, the undue burden test helps courts strike a balance: It says not to interfere with either party's interest unless the state imposes an undue burden. In reality, the undue burden test generates more questions than answers. When does a regular, permissible burden become an undue burden? The plurality chose not to give an answer beyond "[d]efining an 'undue burden'" as a "'substantial obstacle.'" *Id.* at 987 (Scalia, J., concurring in part and dissenting in part). With only this amorphous principle as a guidepost, courts are left to tell states that they can pass laws that "burden a woman's right to choose" as long as it's "not too much." Kathleen M. Sullivan, *The Supreme Court, 1991 Term—Foreword: The Justices of Rules and Standards*, 106 Harv. L. Rev. 22, 33 (1992); *see also "Undue,"* *Black's Law Dictionary* (6th ed. 1990) (defining "undue" as "[m]ore than necessary"). Because courts have free rein to decide what is "too much," the undue burden test allows a "district judge to give effect to his personal preferences about abortion." *Casey*, 505 U.S. at 992 (Scalia, J., concurring in part and dissenting in part).

The last three decades have confirmed Justice Scalia's fears. Rather than mend the Nation's fractures, the *Casey* regime's lack of concrete guidance has generated decades of bitter litigation and widening circuit splits. Consider, for instance, the circuit split over parental notification requirements. *Compare Planned Parenthood v. Camblos*, 155 F.3d 352, 367 (4th Cir. 1998) (en banc), *with Planned Parenthood v. Adams*, 937 F.3d 973, 985–90 (7th Cir. 2019), *and Planned Parenthood v. Miller*, 63 F.3d 1452, 1460 (8th Cir. 1995). Or the split about laws requiring abortion providers to make certain disclosures. *Compare EMW Women's Surgical Ctr. v. Beshear*, 920 F.3d 421, 430–32 (6th Cir. 2019), *and Planned Parenthood v. Rounds*, 686 F.3d 889, 893–906 (8th Cir. 2012), *with Stuart v. Camnitz*, 774 F.3d 238, 244–50 (4th Cir. 2014). Another divide has emerged over nondiscrimination provisions such as section 217. *Compare Preterm*, 994 F.3d at 535, *with Planned Parenthood v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 307–10 (7th Cir. 2018). Even the question of whether states may prohibit certain types of dilation & extraction procedures—namely, the dismemberment of a still-living unborn child—has produced a circuit split. *Compare Whole Woman's Health v. Paxton*, No. 17-51060, 2021 WL 3661318, at *1 (5th Cir. Aug. 18, 2021) (en banc), *with W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1319 (11th Cir. 2018), *and EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 806–07 (6th Cir. 2020). These conflicts, and others like them, highlight that an undue burden is in the eye of the beholder.

It is similarly hard to shake the impression that the undue burden test only permits a state to protect an unborn child's life only "so long as it is not too successful." *Casey*, 505 U.S. at 992 (Scalia, J., concurring in part and dissenting in part). A state that wishes to protect unborn children will naturally pass laws aimed at reducing the number of abortions. But because *Casey* offers no concrete way to assess when a burden becomes "undue," judges often think that *any* decrease in the number of abortions fits the bill. They reason that a law that's too successful at decreasing abortions impermissibly "expresses a preference for childbirth over abortion." *Id.* at 883. Yet efficacy is an odd justification for torpedoing an otherwise constitutional law. That turns the undue burden test into nothing more than a policy call made by judges. After all, how far a law can go in expressing a preference is a "value judgment" that can't be "demonstrated true or false by factual inquiry or legal reasoning." *Stenberg v. Carhart*, 530 U.S. 914, 954 (2000) (Scalia, J., dissenting).

The more faithful approach is to calculate what fraction of women were persuaded to keep their child (and thus weren't unduly burdened) as opposed to those who were stymied from accessing an abortion. But that approach comes with its own challenges. I do not envy the district judge who must determine how each woman chose to exercise her "right to define [her] own concept of existence, of meaning, of the universe, and of the mystery of human life." *Casey*, 505 U.S. at 851. To make matters worse, abortion laws are often challenged before they even go into effect. So judges are stuck guessing as to the numbers and what they mean.[15] Unsurprisingly, many judges either skip this step in the analysis altogether or abandon statistical precision for threadbare speculation.

*Large Fractions*. In most areas of law, facial challenges to a statute's constitutionality must clear a high bar. The plaintiff must show that the statute is unconstitutional in virtually all of its applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987). But abortion is different. Under the undue burden test, courts analyze only whether an abortion restriction "will operate as a substantial obstacle" "in a large fraction of the cases in which" it "is relevant." *Casey*, 505 U.S. at 895. This standard is riddled with ambiguities.

For one, no court has definitively defined a "large fraction." Instead, we've each taken an I-know-it-when-I-see-it approach that treats the test as "more conceptual than mathematical." *Cincinnati Women's Servs. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006). Not surprisingly, everyone sees it differently.

In this circuit, for instance, we've concluded that 12.5 percent is not enough to trigger an undue burden. *Id.* And we've suggested that the line might be north of 50 percent as "it would be odd to hold that a law regulating abortion is facially unconstitutional when it can be applied consistent with the Constitution in a majority of cases." *Bristol Reg'l Women's Ctr.*, 7 F.4th at

---

[15]This is the case even with post-enactment challenges. Take one example from just a few months ago. In *Bristol Regional Women's Center v. Slatery*, we affirmed a Tennessee law that imposes a 48-hour waiting period before all abortions. 7 F.4th 478 (6th Cir. 2021) (en banc). The challengers pointed out that abortions in Tennessee dropped nine percent the year following the waiting period's enactment. They argued that decrease alone proved the law poses an undue burden. But the challengers failed to realize that the drop in abortions could have stemmed from "the persuasive power of the law" rather than "its burdensome qualities." *See A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 714–15 (7th Cir. 2002) (Wood, J., dissenting). And absent additional evidence, we had no way to decide between the two.

485.  Compare that with the Fifth Circuit, where a divided panel held that 30 percent is not a "large fraction." *June Medical Servs. v. Gee*, 905 F.3d 787, 815 (5th Cir. 2018), *rev'd on other grounds*, 140 S. Ct. 2103 (2019).  The Ninth Circuit, by contrast, thinks 21.5 percent is a large fraction.  *See McCormack v. Herzog*, 788 F.3d 1017, 1030 (9th Cir. 2015).  And several respected judges have gone as far as to suggest that laws which bar only one or two percent of women from obtaining abortions may fail the large fraction test.  *See, e.g.*, *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 202 (4th Cir. 2000) (Hamilton, J., dissenting) (noting that it is an "undue burden" if the law "can be expected to prevent one or two out of every 100 low-income women seeking an abortion from being able to obtain one"); *Newman*, 305 F.3d at 708 (Wood, J., dissenting) (noting that the court would "still be required to enjoin" a law "if it affected 'only' 1%" of women).  If a court's answer can range from one to more than fifty percent, then the large fraction test is nothing more than a poorly defined math problem.

These varied results are a product of varied inputs.  As this circuit has already noted, the Court "has not been clear about how to define the numerator and denominator for the fraction." *Preterm*, 994 F.3d at 534; *see, e.g.*, *Reprod. Health Servs. v. Strange*, 3 F.4th 1230, 1269 (11th Cir. 2021) (concluding that the denominator is "roughly four a year—but perhaps several more," and that the numerator is "a handful.").  In *Hellerstedt*, the Court explained that *Casey*'s "large fraction" should be calculated by looking only to "those [women] for whom [the provision] is an actual rather than an irrelevant restriction."  136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 895).  But as Justice Alito noted, that could mean "we are supposed to use the same figure (women actually burdened) as both the numerator and the denominator.  By my math, that fraction is always '1.'"  *Id.* at 2343 n.11 (Alito, J., dissenting).  We know that cannot be right—or else every abortion regulation, no matter how minor, would fail.  So courts are left, once again, to figure out the right answer on their own.

*Benefits & Balancing*.  Perhaps recognizing the lower courts' struggles, the Court reframed the undue burden analysis in *Hellerstedt*.  In that case, the majority struck down a Texas law regulating abortion clinics.  In the process, the majority instructed lower courts to "consider the burdens a law imposes on abortion access together with the benefits those laws confer."  136 S. Ct. at 2309.  In other words, when analyzing a law that regulates abortion, courts

must score the law's benefits against its burdens to determine whether the law imposes a substantial obstacle.

Four years later, when striking down a similar law from Louisiana, the *June Medical* Court failed to produce a majority opinion. While the plurality reaffirmed *Hellerstedt*'s balancing test, the Chief Justice's concurrence concluded that *Hellerstedt* did not change the *Casey* analysis. 140 S. Ct. at 2135 (Roberts, C.J., concurring in judgment). Instead, courts must assess abortion laws on two independent grounds. First, whether the law "pose[s] a substantial obstacle to abortion access." *Id.* And second, whether the law is "reasonably related to a legitimate state interest." *Id.* (cleaned up). The Chief Justice noted that under *Hellerstedt*'s balancing test, "equality of treatment is . . . impossible to achieve; predictability is destroyed; judicial arbitrariness is facilitated; judicial courage is impaired." *Id.* at 2135–36 (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1182 (1989)).

These concerns arise from abortion's unique properties. After all, under the plurality's view in *June Medical*, judges must balance the State's interests in protecting life and the health of the woman against "the woman's liberty interest in defining her 'own concept of existence, of meaning, of the universe, and of the mystery of human life.'" *Id.* at 2136 (quoting *Casey*, 505 U.S. at 851). Weighing such "imponderable values" against one another would be akin to "judging whether a particular line is longer than a particular rock is heavy." *Id.* (citing *Bendix Autolite Corp. v. Midwesco Enter., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in judgment)). And this sort of inquiry, when untethered from statutory and constitutional text, is not a "job for the courts." *Id.*

Nine months later, however, we had a circuit split over which opinion from *June Medical* controls. *Compare EMW Women's Surgical Ctr.*, 978 F.3d at 437, *and Hopkins v. Jegley*, 968 F.3d 912, 915 (8th Cir. 2020), *with Reprod. Health Servs.*, 3 F.4th at 1259, *and Planned Parenthood v. Box*, 991 F.3d 740, 752 (7th Cir. 2021). So today—nearly fifty years after *Roe*—litigants and jurists remain in limbo over the proper constitutional standard.

*Large Fraction Test & Pre-enforcement Challenges.* In most run-of-the-mill constitutional cases, facial challenges are "the most difficult . . . to mount successfully." *City of*

*Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (citation omitted). As discussed above, that's because the plaintiff faces the "heavy burden" of establishing "that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.

But *Salerno* doesn't apply in the abortion context. Instead, the *Casey* plurality crafted the enigmatic "large fraction" test, which invalidates laws that can constitutionally apply to many—or even most—pregnant women. Coupled with the fact that plaintiffs often challenge abortion laws before they go into effect, the test creates a task for judges that is "fundamentally an empirical inquiry." Clare Huntington, *The Empirical Turn in Family Law*, 118 Colum. L. Rev. 227, 250 (2018).

But this is precisely the sort of inquiry that is least suited for pre-enforcement challenges. Judges are good at analyzing statutes and reading contracts. By contrast, we are out of our depth when we're asked to predict what would happen if a law went into effect. The confusion only doubles when both sides enlist experts offering crosscutting evidence. For example, it's common for plaintiffs to contend that abortion regulations inflict psychological harms on some pregnant women who are seeking an abortion. On the other hand, defendants often offer equally compelling testimony about the long-term depression women may experience after obtaining an abortion. *Compare Women's Med. Prof'l Corp. v. Voinovich*, 911 F. Supp. 1051, 1078–81 (S.D. Ohio 1995) (discussing testimony about the mental health effects for pregnant women who cannot obtain abortions), *with Whole Woman's Health All. v. Hill*, 493 F. Supp. 3d 694, 713 (S.D. Ind. 2020) (considering expert testimony that abortion increases mental health problems and suicidal tendencies in women). If district judges must make forecasts that turn on which social science studies they buy, we risk turning Article III adjudication into an ad hoc peer-review journal process. Judicial commissions come with life tenure and salary protections—not a license to engage in statistical guessing games.

That is exactly why the Framers left contentious public-policy issues, like abortion, to state legislatures in the first place. Unlike lawmakers, who can continually reevaluate their findings through standing committees and incremental experimentation, judges hearing pre-enforcement challenges must make snap calls that begin with no evidence on the ground and end with a final judgment that is not easy to amend.

\*    \*    \*

Put together, these doctrinal puzzles are enough to make a judge throw up his or her hands in exasperation and ask what he or she is supposed to do. *Cf. Planned Parenthood v. Box*, 949 F.3d 997, 999 (7th Cir. 2019) (Easterbrook, J., concurring in denial of rehearing en banc). Just consider some of the questions courts must answer. What constitutes an "undue burden"? How about a "substantial" obstacle? What's a large fraction? How do you calculate the denominator? What about the numerator? How do we balance a state's interests in preventing fetal pain, safeguarding the unborn child's life, and preserving the integrity of its medical profession with a woman's interest in obtaining an abortion? Should we update the undue burden test as neonatal science teaches us new things? How do you know if a law prohibited a woman from obtaining an abortion or merely persuaded her to choose life? And how can we divine future consequences from pre-enforcement challenges? Each of these questions—and there are many more—layers discretion upon discretion. Put any three judges on a panel and you could get three different—and equally reasonable—answers for each question.

The undue burden test is "hopelessly unworkable in practice." *Stenberg*, 530 U.S. at 955 (Scalia, J., dissenting) (citations omitted). And it is unworkable because it is neither a clear rule nor a judicially manageable standard. *Cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2496–98 (2019). The test has the added vice of being untethered from constitutional or statutory text. Instead, it takes judges out of our Article III role and makes us answer questions better left in the hands of legislatures. The Founders understood the danger of this. So should we.

C.

If I were viewing this case on a fresh slate, the answer would be clear. As the history shows, the "Constitution does not constrain the States' ability to regulate or even prohibit abortion." *June Medical Servs.*, 140 S. Ct. at 2149 (Thomas, J., dissenting). But as a lower court judge, I have two constitutional duties: one to the text's original meaning and another to Supreme Court precedent. And when these loyalties split—as they do here—I must follow the Court. The structure of our judicial system mandates this fidelity. U.S. Const. art. III, § 1. And we honor the rule of law when we honor their decisions.

Yet even a lower court judge intent on following binding caselaw is often at a loss.  As I have shown above, our doctrine is so tortured that judges can often make "raw judicial policy choices concerning what is 'appropriate' abortion legislation" under the banner of applying the law.  *Casey*, 505 U.S. at 987 (Scalia, J., concurring in part and dissenting in part).  But I cannot in good conscience follow suit.

Distinguished jurists and scholars have concluded that pre-viability bans are inconsistent with a good-faith reading of *Casey*.  *See, e.g.*, *Planned Parenthood v. Comm'r of the Ind. State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting from denial of rehearing en banc) ("*Casey* and other decisions hold that, until a fetus is viable, a woman is entitled to decide whether to bear a child."); *Williamson*, 900 F.3d at 1314 (Ed Carnes, J.); O. Carter Snead, *What It Means to Be Human* 163–64 (2020); Michael Stokes Paulsen, *The Worst Constitutional Decision of All Time*, 78 Notre Dame L. Rev. 995, 995 n.4 (2003); Sherif Girgis, Two Obstacles to (Merely) Chipping Away at *Roe* in *Dobbs* 6 (Aug. 19, 2021) (unpublished manuscript), https://ssrn.com/abstract=3907787.  And I cannot find a principled reason to disagree with them.  *See Casey*, 505 U.S. at 846 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure.").  Thus, *Casey* requires me to affirm the district judge's preliminary injunction with respect to section 216.  Only the Supreme Court can tow our jurisprudence back to the safe harbor of democratic legitimacy.

III.

Though Supreme Court precedent compels me to concur with respect to section 216, the majority's decision to strike down section 217 is its error alone.  And the error is all the more egregious when you consider the circumstances.  Just last year, our en banc court issued a thorough opinion holding that Ohio's nearly identical anti-discrimination law did not violate a woman's substantive due process rights.  *Preterm*, 994 F.3d at 535.  Tennessee's law adds race and gender to the protected class.  Hardly novel.  In striking down the Tennessee provision as void for vagueness, the majority reveals that abortion exceptionalism knows no bounds.  The "ad hoc nullification machine" hums on.  *Madsen*, 512 U.S. at 785 (Scalia, J., concurring in part and dissenting in part).

A.

Start with the basics.  A law is unconstitutionally vague if (1) it fails to give fair notice to ordinary people (in our case, reasonable physicians) of what conduct is prohibited or (2) it invites arbitrary and discriminatory enforcement.  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see Planned Parenthood v. DeWine*, 696 F.3d 490, 502 (6th Cir. 2012).  In pre-enforcement challenges, courts focus on the first prong, since the possibility that the statute might be enforced in odd ways is still "speculative" when it has not yet been enforced.  *Gonzales*, 550 U.S. at 150; *DeWine*, 696 F.3d at 505–06.  Courts must be vigilant in making sure a statute is understandable—people "of common intelligence cannot be required to guess at the meaning." *Winters v. New York*, 333 U.S. 507, 515 (1948).  And when dealing with a criminal statute, we look to see if that statute has "a core of understandable meaning."  *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 540 (7th Cir. 2019) (Easterbrook, J.).

But the fact that there may be some "uncertainty at the margins does not condemn a statute."  *Id.*  Law professor hypotheticals and dreamed-up scenarios will not render a statute void for vagueness.  After all, if they did, no statute could pass constitutional muster.  Indeed, under the Supreme Court's jurisprudence, if we can determine a statute's core meaning, that is "enough to reject a vagueness challenge, leaving to future adjudication the inevitable questions at the statutory margins."  *Id.* at 541; *see also United States v. Williams*, 553 U.S. 285, 306 (2008) (noting that close cases are not addressed by "the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt").

To determine a statute's core meaning, we start with the text.  Section 217 says:

> A person shall not perform or induce, or attempt to perform or induce, an abortion upon a pregnant woman if the person knows that the woman is seeking the abortion because of [the sex, race, or potential Down syndrome diagnosis of] the unborn child.

Tenn. Code Ann. § 39-15-217(b)–(d).  Any reasonable physician would have fair notice of how it works.  When a patient requests an abortion, the doctor asks himself:  Does she want this abortion because the unborn child is a boy (or girl)?  Of a particular race?  Likely to have Down syndrome?  If the answer to any of these questions is yes, then section 217 forbids the doctor

from performing the abortion.  If the answer is no or I don't know, then the doctor is free to perform the procedure.  We can identify section 217's core meaning, so our inquiry should end there.

But the challengers and the majority insist that section 217 is far more convoluted.  They target "knows" and "because of."  Only lawyers, "indoctrinated from the first days of law school to find ambiguity in even the clearest of pronouncements," could find these everyday terms confusing.  Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2139 (2016) (book review).   No amount of exegesis can transform everyday English into unconstitutional vagueness.

Begin with "knows."  The statute defines "knowing" as being "aware of the nature of the conduct or that the circumstances exist."  Tenn. Code Ann. §§ 39-11-106(a)(22), 39-11-302(b).  This requires actual awareness; negligence does not suffice.  Doctors are not held to account for what they reasonably should have, but in fact did not, infer.  *See State v. Pendergrass*, 13 S.W.3d 389, 394–95 (Tenn. Crim. App. 1999).

As for "because of," the General Assembly did not define the term.  But it didn't have to—we apply its ordinary meaning.  *See Burrage v. United States*, 571 U.S. 204, 210 (2014).[16]  Colloquially, the phrase means "on account of," or "by reason of."  *The American Heritage Dictionary* 158 (5th ed. 2018); *Webster's Third New International Dictionary* 194 (2002); 2 *The Oxford English Dictionary* 41 (2d ed. 1989).   As in, what is the reason for this patient's abortion?[17]

---

[16]In *Burrage*, two circuit courts split over the type of causation meant by "results from."  The Seventh Circuit said it codified "but for" causation.  *United States v. Hatfield*, 591 F.3d 945, 948 (7th Cir. 2010).  The Eighth Circuit, by contrast, said it only meant a "contributing cause."  *United States v. Monnier*, 412 F.3d 859, 862 (8th Cir. 2005).  But neither court held it was void for vagueness.  This just goes to show how far the majority is willing to go to declare this provision constitutionally void.

[17]Indeed, Tennessee statutes seem to use "because of" and "by reason of" interchangeably in the discrimination context.  *Compare* Tenn. Code Ann. § 50-3-409(a) (prohibiting discrimination against an employee "because of the exercise . . . of any rights afforded by this chapter"), *with id.* § 49-5-606(a)(1) (prohibiting discrimination "by reason of [an employee's] exercise of rights guaranteed by this part"), *and id.* § 50-2-202(c) (prohibiting discrimination "by reason of any action taken by the employee" to invoke legal rights).

The legal meaning follows from the ordinary meaning. "Because of" denotes causation. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–48 (2013). And unless the statute tells us otherwise, courts generally interpret the term to require at least "but-for" causality. *Id.*; *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009); *United States v. Miller*, 767 F.3d 585, 591– 92 (6th Cir. 2014). In other words, but for this cause (or reason), would the same result have occurred?

Applying this understanding to section 217, sex, race, or Down syndrome status need not be the only or most important reason for the abortion. *Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 438 n.11 (Tenn. Ct. App. 2015); *accord Burrage*, 571 U.S. at 211. But it must be a dispositive reason. So to succeed in any section 217 case, the prosecution must prove beyond a reasonable doubt that the woman would not have had the abortion but for the protected characteristic and that the doctor knew this.

Context confirms this ordinary meaning. Countless discrimination and hate-crime statutes nationwide use *because of* like section 217 does. *See, e.g.*, 18 U.S.C. § 249 (federal hate-crime statute); 29 U.S.C. § 623 (age discrimination statute); 42 U.S.C. § 12112(b) (Americans with Disabilities Act). Indeed, many of these statutes have been interpreted in a similar manner. *See Miller*, 767 F.3d at 591 (federal hate-crime statute); *Gross*, 557 U.S. at 176– 77 (age discrimination statute); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (Americans with Disabilities Act). And none have been struck down as void for vagueness. *See, e.g.*, *United States v. Jenkins*, 909 F. Supp. 2d 758, 776–79 (E.D. Ky. 2012) (rejecting a vagueness challenge to the federal hate-crime statute); *In re M.S.*, 896 P.2d 1365, 1375–76 (Cal. 1995) (rejecting a vagueness challenge to a California hate-crime statute with a broader, contributing-cause interpretation).

Not to be deterred, the challengers and majority instead home in on the combination of "knows" and "because of." They argue that the two phrases *together* make section 217 vague.

But they've got it backwards. As the Supreme Court has explained, "scienter requirements alleviate vagueness concerns"; they don't create them.[18] *Gonzales*, 550 U.S. at 149. Indeed, the knowledge requirement here protects doctors who incorrectly (but in good faith) conclude that a patient would have sought an abortion regardless of the protected characteristic. *See DeWine*, 696 F.3d at 505. The majority notes that it is often difficult to know why a patient makes her decision. Maj. Op. at 26. Perhaps. But if that's true, then doctors will be relieved of any criminal liability. The General Assembly has never required that doctors seek out why a patient wants an abortion. *Cf.* Ark. Code Ann. § 20-16-2103(b)(1) (requiring doctors to ask patients about evidence of fetal Down syndrome); Miss. Code Ann. § 41-41-407(1) (mandating that doctors "first confirm[] that the abortion is not being sought because of" a protected characteristic). The identified difficulty shields those acting in good faith.

The challengers (and the majority) respond that section 217 still poses a problem when a woman's ultimate decision is a result of many factors. Imagine a pregnant mother of three, working her way through school and experiencing financial hardship, who receives a fetal diagnosis of Down syndrome and asks for an abortion. Is she seeking the abortion *because of* the diagnosis? Her busy schedule? A lack of resources? All three? Two of the three? She may not know herself. But in that case, nor would her doctor. And section 217 kicks in only if they both know that she would have made a different decision but for the diagnosis. In the end, a judge's hypothetical cannot make a statute void for vagueness. *See Curry*, 918 F.3d at 540. Those hard cases are instead best handled in future as-applied challenges. *See DeWine*, 696 F.3d at 505–06.

What's more, section 217 is hardly alone in requiring proof that a defendant knew another person's state of mind. *See, e.g.*, Appellants' Brief 28 (citing conspiracy, facilitation of a felony, rape, and assisted suicide); Brief of Kentucky & 17 Other States as Amici 5–6 (theft of property and possession of an eavesdropping device). Countless state and federal laws, for example, criminalize the aiding and abetting of a hate crime. To prove a hate crime, the state

---

[18]For this reason, the majority's repeated invocation of *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997), is unpersuasive. In *Voinovich*, the statute "contain[ed] no scienter requirement." *Id.* at 204. Here, by contrast, the statute contains a stringent scienter requirement—actual knowledge. *See* Tenn. Code Ann. §§ 39-11-106(a)(22), 39-11-302(b). And this, coupled with the statute's "because of" standard, renders the statute's operation clear.

must show that a defendant took certain action *because of* a victim's protected characteristic. And to prove another individual aided and abetted that hate crime, the state must then show that this second individual *knew* of the crime he was assisting—namely, the first defendant's action *because of* a protected characteristic. Are those prosecutions all unconstitutional? Under the majority's logic, yes.

And it doesn't stop there. Imagine any number of scenarios:

- You cannot hire an applicant to work as a schoolteacher if you *know* a prior employer fired her *because of* allegations of sexual misconduct.

- You cannot provide shelter to a person if you *know* that the person seeks shelter *because of* his recent escape from prison.

- You cannot invest based on information that you *know* the informant learned *because of* an insider position.

None of these commands are difficult to comprehend. But under the majority's reasoning, they are all unconstitutional.

The majority contends that the aiding-and-abetting laws to which I point "involve criminal conduct by a third party that has already been determined." Maj. Op. at 27. "By the time the jury evaluates whether a defendant was guilty of aiding and abetting a hate crime, the subjective intent of the third party is no longer at issue." Maj. Op. at 28. Not so. There may be any number of reasons why the third party's subjective intent is not yet determined. Imagine a hypothetical hate crime where the third-party assailant died before the defendant's trial begins. Does this mean the defendant is now off the hook? Of course not. Nor would the defendant necessarily be off the hook if the third-party assailant fled the state or even if he were acquitted. *See, e.g.*, *Standefer v. United States*, 447 U.S. 10, 19 (1980) (explaining that 18 U.S.C. § 2 "evinces a clear intent to permit the conviction of accessories to federal criminal offenses despite the prior acquittal of the perpetrator of the offense"); *State v. Harvell*, 415 S.W.3d 853, 859 (Tenn. Crim. App. 2010) (holding the same for Tennessee law).

The majority commits one more error along the way. It notes that abortion is legal while the third-party conduct is illegal in statutes targeting the aiding and abetting of hate-crime laws. True enough. But whether the underlying conduct is legal or illegal has no bearing on the clarity

or vagueness of a particular criminal statute. To use another hypothetical, one can imagine a statute that forbids aiding and abetting race-discriminatory employment practices. Here, firing an employee is perfectly legal—it becomes illegal only if it's done because of race. But the law could still penalize an actor for helping a supervisor to discharge an employee, where the actor knows the supervisor is acting on account of the employee's race.

Maybe the real concern underlying the majority's analysis is the risk of false convictions. After all, a police officer or prosecutor may wrongly suspect that the physician knew his patient sought an abortion for a listed reason. But that is true of every criminal law and in every criminal case. That is why the burden of proof is high (guilt beyond a reasonable doubt) and the jury unanimity requirement exists. To accept the majority's argument is to declare trial by jury—a process enshrined not once, but twice in the Constitution—constitutionally insufficient.

B.

Under a commonsense reading, section 217 is not unconstitutionally vague. State law confirms this. *See City of Chicago v. Morales*, 527 U.S. 41, 61 (1999) (applying state court precedent to interpret a state statute); *DeWine*, 696 F.3d at 504 & n.14.

Basic principles of federalism require us to undertake an especially diligent effort to uphold section 217. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 456 (2008). The majority goes in precisely the opposite direction today.

Start with Tennessee principles of statutory interpretation. First, the state's savings canon mandates that courts "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." *State v. Pickett*, 211 S.W.3d 696, 700 (Tenn. 2007) (cleaned up). And second, under Tennessee's rule of lenity, any indeterminacies in a criminal statute are resolved in the criminal defendant's favor. *State v. Marshall*, 319 S.W.3d 558, 563 (Tenn. 2010). Both rules require us to construe any indeterminacy in favor of the doctor and thereby uphold the law.

Even assuming we can't find a constitutionally palatable interpretation of section 217, we have an obligation to certify key questions to a state's high court before we annihilate a separate sovereign's statute. Tenn. Sup. Ct. R. 23 § 1; *Elkins v. Moreno*, 435 U.S. 647, 660–62 (1978).

This is because the state courts, empowered by Tennessee interpretive rules to save state statutes, are better positioned to modify their laws to cohere them with the Constitution. *See Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 379, 385–86 (6th Cir. 2018) (Larsen, J., dissenting in part). As the Supreme Court has warned in a related context, state courts have "special competence in [their] law" whereas federal courts should "have little confidence in our independent judgment regarding the application of that law to the present situation." *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 499 (1941). The majority should have heeded this advice before striking down Tennessee's law.

*    *    *

In the end, under the majority's approach, "every time a court needs to decide a tough question about just how far a statute reaches, it should declare the law unconstitutional." *Curry*, 918 F.3d at 541. That is normally not the law. And it is not even the law in abortion jurisprudence. Until now.

IV.

I concur in the judgment as to section 216 because *Casey* compels our decision. But precedent dictates no such mistake with regard to section 217.

Justice Holmes once remarked that "a page of history is worth a volume of logic." *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921). The argument that the Constitution contains a right to abortion has neither. As shown above, the historical evidence is clear. The Constitution leaves decisions like this to the states. The state legislatures can do what we can't: listen to the community, create fact-specific rules with appropriate exceptions, gather more evidence, and update their laws if things don't work properly. And if the public is unhappy, it can fight back at the ballot box. The courts should return this choice to the American people—where it belongs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 20-5969

MEMPHIS CENTER FOR REPRODUCTIVE HEALTH;
PLANNED PARENTHOOD OF TENNESSEE AND NORTH
MISSISSIPPI;     KNOXVILLE     CENTER     FOR
REPRODUCTIVE HEALTH; FEMHEALTH USA, INC.,
d/b/a carafem; DR. KIMBERLY LOONEY; DR. NIKKI
ZITE,

     Plaintiffs - Appellees.

     v.

HERBERT H. SLATERY, III; LISA PIERCEY, M.D.; RENE
SAUNDERS, M.D., W. REEVES JOHNSON, JR., M.D.;
AMY P. WEIRICH; GLENN R. FUNK; CHARME P.
ALLEN; TOM P. THOMPSON, JR.,

     Defendants - Appellants.

> **FILED**
> Sep 10, 2021
> DEBORAH S. HUNT, Clerk

Before: DAUGHTREY, MOORE, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's judgment enjoining implementation of sections 216 and 217 of House Bill 2263 is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk